# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE THE HONORABLE TIMOTHY C. STANCEU**

| | |
|---|---|
| **T.B. WOOD'S INCORPORATED** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Consol. Ct. No. 17-00022** |
| | ) |
| **UNITED STATES,** | ) |
| | ) **NONCONFIDENTIAL** |
| **Defendant.** | ) **VERSION** |
| | ) |

## DEFENDANT-INTERVENORS' CHINA CHAMBER OF INTERNATIONAL COMMERCE'S AD HOC COALITION OF PRODUCERS AND EXPORTERS OF CERTAIN IRON MECHANICAL TRANSFER DRIVE COMPONENTS FROM THE PEOPLE'S REPUBLIC OF CHINA AND POWERMACH IMPORT & EXPORT CO., LTD. (SICHUAN) RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Dated:   October 16, 2017

Jeffrey S. Grimson
Kristin H. Mowry
Jill A. Cramer
James C. Beaty
Bryan P. Cenko*
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to China Chamber of International Commerce's ad hoc Coalition of Producers and Exporters of Certain Iron Mechanical Transfer Drive Components from the People's Republic of China and Powermach Import & Export Co., Ltd. (Sichuan)*
*Admitted only in Maryland. Practice directly supervised by principals of the firm admitted to the D.C. bar.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.     ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED ........................ 1

II.    ISSUE PRESENTED ................................................................................................. 1

III.   STATEMENT OF FACTS ......................................................................................... 2

IV.    SUMMARY OF ARGUMENT ................................................................................... 6

V.     STANDARD OF REVIEW ....................................................................................... 7

VI.    ARGUMENT ......................................................................................................... 9

   A.   There Was No Fatal Flaw in the Commission's Economic Logic ...................................... 9

   B.   The Commission Adequately Explained its Determination that Subject Imports Did Not
   Increase Market Share or Shift Market Share Away from Domestic IMTDCs ........................ 12

   C.   The Commission's Conclusion on Pricing Effects Was Supported by Substantial
   Evidence and in Accord with Law ........................................................................... 20

   D.   The Commission Properly Explained its Conclusions Regarding Impact ........................ 29

   E.   The Commission's Threat Determination Was Supported by Substantial Evidence and in
   Accordance with Law ........................................................................................... 33

VII.   ADOPTION OF ARGUMENTS MADE BY COMMISSION IN SUPPORT OF ITS
NEGATIVE DETERMINATION .................................................................................... 41

VIII.  CONCLUSION .................................................................................................... 41

# TABLE OF AUTHORITIES

## Cases

AK Steel Corp. v. United States, 2016 Ct. Intl. Trade LEXIS 122 (2016).................................. 12

Altx, Inc. v. United States, 25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ..................................... 26

Altx, Inc. v. United States, 26 CIT 1425 (2002).......................................................................... 20

Altx, Inc. v. United States, 26 CIT 709 (2002)............................................................................ 25

Altx, Inc. v. United States, 370 F.3d 1108 (Fed. Cir. 2004) .......................................................... 8

Aluminum Extrusions Fair Trade Comm. v. United States, 2012 Ct. Intl. Trade LEXIS 134
    (2012)......................................................................................................................... 8, 17

Atl. Sugar, Ltd. v. United States, 744 F.2d 1556 (Fed. Cir. 1984) ............................................... 8

Bratsk Aluminum Smelter v. United States, 444 F.3d 1369 (Fed. Cir. 2006) ............................ 32

Celanese Chems. Ltd. v. United States, 31 CIT 279 (2007).......................................................... 34

Comm. for Fair Beam Imps. v. United States, 27 CIT 932 (2003)............................................... 34

Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197 (1938)........................................................... 7

CP Kelco US, Inc. v. United States, __ CIT __, 24 F. Supp.3d 1337 (2014)................................. 8

Diamond Sawblades Mfrs. Coalition v. United States, 32 CIT 134 (2008) ................................ 18

Elkem Metals Co. v. United States, 28 CIT 1087, 342 F. Supp. 2d 1207 (2004).................. 19, 20

Gerald Metals, Inc. v. United States, 132 F.3d 716 (Fed. Cir. 1997) ......................................... 32

Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369 (Fed. Cir. 2003)........................... 7

Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927 (Fed. Cir. 1984).............................. 8

Mexichem Fluor Inc. v. United States, __ CIT __, 179 F. Supp. 3d 1238 (2016)....................... 12

Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867 (Fed. Cir. 2008)...................... 11, 32

Nevinnomysskiy Azot v. United States, 32 CIT 642, 565 F. Supp. 2d 1357 (2008)................... 17

Nippon Steel Corp. v. United States, 337 F.3d 1373 (Fed. Cir. 2003) .................................. 35, 36

Nippon Steel Grp. v. Int'l Trade Comm'n, 345 F.3d 1379 (Fed. Cir. 2003) .............................. 11

Nucor Fastener Div. v. United States, __ CIT __, 791 F. Supp. 2d 1269 (2011) .................. 16, 17

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)..................................................................... 11

QVD Food Co., Ltd. v. United States, 658 F.3d 1318 (Fed. Cir. 2011) ...................................... 18

Roses, Inc. v. United States, 13 CIT 662, 720 F. Supp. 180 (1989)............................................ 17

Swiff-Train Co. v. United States, 793 F.3d 1355 (Fed. Cir. 2015)................................................ 7

Swiff-Train Co. v. United States, __ CIT __, 904 F. Supp. 2d 1336 (2013)............................... 11

Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330 (Fed. Cir. 2002) .................. 36

Taian Ziyang Food Co. v. United States, __ CIT __,  918 F. Supp. 2d 1345 (2013) ................... 15

Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 806 F. Supp. 1008 (1992) ....... 18

U.S. Steel Corp. v. United States, __ CIT __, 856 F. Supp. 2d 1318 (2012) ........................ 30, 33

Usinor v. United States, 28 CIT 1107, 342 F. Supp. 2d 1267 (2004) ....................................... 8, 26

Whirlpool Corp. v. United States, 2013 Ct. Intl. Trade LEXIS 166 (2013) ................................. 8

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................................................... 7

19 U.S.C. § 1671 ...................................................................................................................... 36

19 U.S.C. § 1673 ...................................................................................................................... 36

19 U.S.C. § 1673d(b)(1) ................................................................................................ 11, 30, 34

19 U.S.C. § 1677(7)(C)(ii) ........................................................................................................ 20

19 U.S.C. § 1677(7)(C)(iii) ....................................................................................................... 12

19 U.S.C. § 1677(7)(F)(ii) ........................................................................................................ 34

28 U.S.C. § 2639(a)(1) (2012) .................................................................................................... 7

**Other Authorities**

Certain Iron Mechanical Transfer Drive Components from Canada and China, Inv. Nos. 701-TA-550 and 731-TA-1304-1305, USITC Pub. 4652 (Dec. 2016) (Final) ......................................... 1

Crystalline Silicon Photovoltaic Cells and Modules from China, Inv. Nos. 701-TA-481, 731-TA-1190, USITC Pub. 4295 (Dec. 2011) (Prelim.) ........................................................................ 10

Diamond Sawblades and Parts Thereof From China and Korea, Inv. Nos. 731-TA-1092-1093, USITC Pub. 4007 (May 2008) (Final) .................................................................................. 28

Hardwood Plywood from China, Inv. Nos. 701-TA-490, 731-TA-1204, USITC Pub. 4434 (Dec. 2013) (Final) ........................................................................................................................ 39

Prestressed Concrete Steel Wire Strand from China, Inv. Nos. 701-TA-464 and 731-TA-1160, USITC Pub. 4086 (July 2009) (Prelim) ................................................................................ 34

In accordance with USCIT Rule 56.2(c), Defendant-Intervenors, the China Chamber of International Commerce's ad hoc Coalition of Producers and Exporters of Certain Iron Mechanical Transfer Drive Components from the People's Republic of China and Powermach Import & Export Co., Ltd. (Sichuan), submit the following memorandum in opposition to the motion for judgment on the agency record and accompanying brief of Plaintiff, TB Wood's Incorporated ("TB Wood's" or "Plaintiff").  See Pl. R. 56.2 Mot., ECF Nos. 26 (Confidential) (Sept. 1, 2017) & 27 (Nonconfidential) (Sept. 1, 2017) ("Pl. Br.").[1]

## I.   ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

TB Wood's challenges the final determination of the U.S. International Trade Commission ("Commission") in the antidumping and countervailing duty investigations of certain iron mechanical transfer drive components from Canada and the People's Republic of China.  See Certain Iron Mechanical Transfer Drive Components from Canada and China, Inv. Nos. 701-TA-550 and 731-TA-1304-1305, USITC Pub. 4652 (Dec. 2016) (Final) (P.R. 192) ("Final Determination").[2]

## II.   ISSUE PRESENTED

**Whether the Court must remand the Commission's unanimous negative decision that there was no injury or threat thereof to the domestic iron mechanical transfer drive components (IMTDC) industry on the basis that the Commission failed to adequately explain its conclusions or to support them with substantial evidence.**

After thorough consideration of the parties' arguments and a well-documented, careful analysis of the record evidence, the Commission properly determined based upon substantial evidence that the domestic industry was neither materially injured nor threatened with material injury by reason of IMTDCs imported from Canada and China.  TB Wood's here does nothing

---

[1]  All references to Plaintiff's brief are to the nonconfidential version unless otherwise noted.

[2]  Citations to documents in the administrative record are in the form "P.R. __" or "C.R. __."

more than ask the Court to impermissibly reweigh the evidence. Ample record evidence supports the Commission's factual conclusions. The Court must, therefore, sustain the Commission's unanimous Final Determination in full.

### III. STATEMENT OF FACTS

Plaintiff's factual recitation omits key elements of the record. In its petition, Petitioner TB Wood's advocated for the exclusion of companies whose U.S. operations were limited to finishing unfinished imported IMTDCs. See Petition at Vol. I, p. 3-4 (Oct. 28, 2017) (Public Version) (P.R. 1). The record indicates, that although the Department of Commerce found that Plaintiff's petition met the statutory industry support standard, Final Determination at 7 (P.R. 192), TB Wood's accounted for [███████] percent of the domestic industry by volume (pieces) and made [████████████████] during the period of investigation ("POI") (i.e., 2013-interim 2016). See Confidential Views of the Commission at 28 (Dec. 14, 2016) (C.R. 533) ("Confidential Views"). These facts are important as the Court considers the persistent tension between the arguments and testimony presented by TB Wood's and the record evidence collected by the Commission.

TB Wood's contends that the Commission's "collection of trade and financial data from the domestic industry largely ignored distinctions in products diameter." Pl. Br. at 2. Far from ignoring product diameter, the Commission affirmatively found that there was no distinction to be made within the domestic like product on the basis of diameter. See Final Determination at 12-15 (P.R. 192). The Commission applied its usual method and found that there was no cognizable distinction to be made within the definition of domestic like product on the basis of size. See id. at 14, I-40-42. But the Commission noted the numerous revisions made by TB Wood's to the scope language and observed that "the five-paragraph scope in the petition

eventually expanded to 12 paragraphs and a table, collectively consisting of more than three single-spaced pages." Id. at 4.

Plaintiff's discussion of the volume changes over the POI is also selectively sourced.  It is true that the Commission found that "subject imports of large-diameter IMTDC increased 7.4% by volume (pieces) and 10.3% by value from 2013-2015."  Pl. Br. at 3.  The Commission's data show, however, a more muted trend on the basis of U.S. importers' U.S. shipments.  Table IV-3 of the Commission's Final Determination reflects an increase in subject imports of only 2.3 percent by volume (piece) and a decrease of 4.8 percent by value.  See Final Determination at IV-8 (Table IV-3) (P.R. 192).[3]  Similarly, TB Wood's notes that "{b}y 2015, large-diameter subject import by volume represented more than [███] of U.S. production of large-diameter finished IMTDCs." Pl. Br. at 3 (Confidential Version).  TB Wood's claims that a similar comparison of all diameters of U.S. production reflects an [████████] percent. Id.  TB Wood's fails to note, however, that the ratio of subject imports to U.S. production [███ ██████████████████████████] at the end of the POI than it was at the beginning. CSR at IV-6 (Table IV-2) (C.R. 521).

Plaintiff's factual statements regarding the Commission's findings on volume also ignore the presence of [██████] nonsubject merchandise in the market, specifically nonsubject merchandise emanating from Mexico.  The Commission found that "Mexico was one of the largest reported nonsubject sources for U.S. imports of IMTDCs. . . ."  Final Determination at IV-6 (P.R. 192).  In 2015, Mexico accounted for [███] percent of U.S. large-diameter imports by volume and [███] percent of U.S. small-diameter imports.  CSR at IV-8 (C.R. 521).  Notably,

---

[3]  These figures were calculated by comparing the volume and value of U.S. shipments in 2013 versus 2015 using the figures in Table IV-3.

TB Wood's has an affiliate that manufactures IMTDCs in Mexico.  <u>See</u> Final Determination at 34 (P.R. 192).  Here too TB Wood's has omitted key facts from its arguments.

Despite protestations by Petitioner's own witnesses at the hearing that the pricing data do not reflect what was going on in the market, the Commission found the reliability of the data to be high.  <u>See, e.g.,</u> <u>Certain Iron Mechanical Transfer Drive Components from Canada and China</u>, Hearing Tr. at 19 (Nov. 29, 2016) ("Hearing Tr.") (P.R. 185) (Crist); <u>id.</u> at 27 (Shields); <u>id.</u> at 31 (Christenson).  Namely, the Commission found that "{t}he pricing data collected in these investigations are 'meaningful,' 'rock solid,' and 'representative' of competition in the U.S. market."  Final Determination at 40 (P.R. 192) (internal citation omitted).  In other words, the record evidence contradicted the suggestion of Petitioner's witness that "prices have dropped around 30 percent since Canadian and Chinese imports entered the market" and "we constantly have to decide whether to cut prices or lose business."  Hearing Tr. at 20 (Crist) (P.R. 185); <u>id.</u> at 26 (Shields).

Plaintiff's presentation of the Commission's underselling analysis also overlooks relevant information.  TB Wood's states that "subject IMTDCs undersold domestic goods in 217 of 228 comparisons, by margins up to 84.8%."  Pl. Br. at 4.  But this factual recitation does not tell the complete story.  Again, a closer examination of the record reveals that the average margin of underselling was 37.4 percent, less than half of the apogee of underselling.  <u>See</u> Final Determination at V-10 (Table V-9) (P.R. 192).  The Commission found that "many of the pricing products show that the domestic industry did experience price increases during the POI."  <u>Id.</u> at 42.  The Commission further observed that "{p}rice increases generally would not be expected in a period of overall declines in apparent U.S. consumption during which there were no substantial cost increases."  <u>Id.</u>

TB Wood's also claims that domestic industry performance was poor, citing capacity utilization, income, shipments. Pl. Br. at 4. TB Wood's does not, however, provide the complete picture. It fails to note, for example, the [⬛] in the oil and gas sector. In the Final Determination, the Commission staff noted that TB Wood's identified oil and gas applications as [⬛] percent of the market for ITMDCs and one of the main sectors that drives demand. See CSR at II-9 (C.R. 521). The [⬛] in this portion of the market, as well as generally declining demand, was well documented in the record before the Commission. See Powermach's Pre-Hearing Br. at 18-22 (Confidential Version) (C.R. 473).

Like the pricing and industry performance data, inventory data collected by the Commission does not undermine the Commission's determination despite TB Wood's claims to the contrary. Although a witness for TB Wood's testified at the hearing that "{w}e have also seen significant increases in inventories held by both producers and importers," Hearing Tr. at 22 (Crist) (P.R. 185), the Commission's data tell a more nuanced story. Inventories of subject imports [⬛] percent from 2013 to 2015. CSR at C-3 (Table C-1) (C.R. 521). Canada, however, which [⬛

⬛]. See id. There was a [⬛

⬛

⬛

⬛]. See id. U.S. importers' inventories of Canadian imports [⬛] percent over the POI. See id. U.S. importers' inventories of subject merchandise imported from China, meanwhile, [⬛] percent over the period. See id.

Statements by TB Wood's provide no basis to set aside the Commission's determination. The Commission is bound to make a decision on the data collected in order to assess the impact

of subject imports on the domestic industry as a whole, not just the experience of TB Wood's based on anecdotal evidence.  A full accounting of the record is required to objectively examine whether there is merit to Plaintiff's claims.  In view of the entire record, the Commission's determination was supported by substantial record evidence and in accordance with law.

## IV.   SUMMARY OF ARGUMENT

Plaintiff's brief, challenging a unanimous decision of the Commission, is pinned on an incomplete rendering of the facts on the record.  Under the applicable standard of review, the Final Determination is presumed to be correct and the Court must ascertain only whether there was evidence on the record that could reasonably support the Commission's conclusion.  Here, considering the record as a whole, the Commission's conclusions were supported by substantial evidence and in accordance with law.  First, there is no legal support for Plaintiff's claim that the Commission's determination should be overturned because the agency's economic logic was flawed.  Numerous record findings support the Commission's determination that there was a lack of evidence showing that any injury to the domestic industry was caused by subject imports, including the decline in the domestic industry during a period of declining apparent consumption, the industry's own cost structure, the lack of a cost-price squeeze and increases in pricing during a period where the volume of imports was significant.  Second, the Court should reject Plaintiff's challenge to the Commission's market share determination on the basis of data flaws and low data coverage given that the Commission collected data based on the domestic like product and scope language framed by TB Wood's itself and the data coverage was addressed by the Commission and properly found to be sufficiently high to allow for a reasonable analysis. Third, the Commission's conclusion on pricing effects was supported by substantial evidence and in accordance with law because the data show no clear pricing trends

and the specific pricing product data for [███████████████] pricing products actually

[█████████████████████████████████████████████] over the POI.

Fourth, TB Wood's arguments on the Commission's impact determination is also marred by an

inadequate and less-than-fulsome reading of the record and the impact of nonsubject imports and

other factors unrelated to imports.  Finally, the Commission's threat determination was supported

by substantial evidence and in accordance with law given the [████████] in Canadian and Chinese

imports over the POI and the lack of evidence supporting the Plaintiff's allegations that unused

capacity and home market factors showed an imminent increase in imports of the subject

merchandise.  For these reasons, the Court should sustain the Commission's unanimous Final

Determination in full.

## V.   STANDARD OF REVIEW

Plaintiff's Rule 56.2 Motion and accompanying brief provide no reason for this Court to

overturn the Commission's unanimous negative final determination under the governing standard

of review.  The Final Determination is "presumed to be correct," and the "burden of proving

otherwise shall rest upon the party challenging such decision." 28 U.S.C. § 2639(a)(1) (2012).

To meet this burden, Plaintiff must prove that the Final Determination is not supported by

substantial evidence or otherwise not in accordance with law.  <u>See</u> 19 U.S.C. §

1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." <u>Huayin Foreign Trade Corp. v. United States</u>, 322 F.3d 1369,

1374 (Fed. Cir. 2003) (internal citation omitted).  Substantial evidence requires "more than a

mere scintilla," <u>Swiff-Train Co. v. United States</u>, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (citing

<u>Consol. Edison Co. of N.Y. v. NLRB</u>, 305 U.S. 197, 217 (1938)); <u>Atl. Sugar, Ltd. v. United</u>

States, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (internal citation omitted).  This standard is satisfied by "something less than the weight of the evidence."  Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984) (internal citation omitted).  Under the substantial evidence standard, therefore, the reviewing Court's "function is merely to ascertain 'whether there was evidence which could reasonably lead to the Commission's conclusion.'"  CP Kelco US, Inc. v. United States, __ CIT __, 24 F. Supp.3d 1337, 1344 (2014) (quoting Matsushita, 750 F.2d at 933).  The Commission, however, "need not address every piece of evidence presented by the parties; absent a showing to the contrary, the court presumes that the ITC has considered all of the record evidence."  Whirlpool Corp. v. United States, 2013 Ct. Intl. Trade LEXIS 166, at * 7 (2013) (citing Aluminum Extrusions Fair Trade Comm. v. United States, 2012 Ct. Intl. Trade LEXIS 134 (2012)).  Indeed, for the Final Determination to be supported by substantial evidence, the Commission need only address "significant arguments and evidence which seriously undermines its reasoning and conclusion."  Altx, Inc. v. United States, 370 F.3d 1108, 1113 (Fed. Cir. 2004) (internal citation omitted).

Furthermore, the "Commission has the right to make credibility determinations and to resolve conflicts in the evidence."  Aluminum Extrusions Fair Trade Comm., 2012 Ct. Intl. Trade LEXIS 134, at * 20 (internal citation omitted).  In sum, the Court "may not reweigh the evidence or substitute its own judgment for that of the agency."  Usinor v. United States, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (internal citation omitted).  Here, the Final Determination was supported by substantial record evidence explained in a well-reasoned written determination.  The Court should sustain the Commission's unanimous Final Determination in full.

## VI.    ARGUMENT

TB Wood's would have the Court step into the shoes of the Commission to make its own

de novo determination.   When considered in light of the complete record considered by the

Commission and under the applicable standard of review, there is no basis for this Court to

remand the Commission's unanimous negative injury and threat determinations.

### A.  There Was No Fatal Flaw in the Commission's Economic Logic

The first claim by TB Wood's is that "the agency's determinations as a whole are tainted

by its failure to reconcile its conclusion that there was no correlation between subject imports

and domestic industry performance with basic economic logic."  Pl. Br. at 9-10.   The Court

should reject this claim.  First, nothing in the statute refers to "economic logic," and TB Wood's

cites to no authority for overturning the Commission's negative determination based on a general

complaint of lack of economic logic.   Further, Plaintiff's allegation is based on its own myopic

reading of the record.  TB Wood's asserts that because the Commission found large volumes of

subject imports during the POI, underselling and high substitutability, the Commission's

negative determination on the basis of a lack of correlation between subject imports and the

domestic industry's condition was unexplained and unsupported.  See id. at 11-12.  TB Wood's

omits numerous key record evidence findings that contradict its claim.

To support its conclusions regarding the lack of correlation between subject imports and

the domestic industry condition, the Commission noted numerous factors endemic to the

domestic industry as well as the lack of evidence showing association with subject imports.  For

example,

- "The sharpest decline in the domestic industry's financial performance occurred between 2014 and 2015 during a period of declining apparent consumption" during which "the domestic industry maintained a stable or higher market share."   Final Determination at 46 (P.R. 192).

- "the record indicates a relationship between unfavorable changes in the industry's cost structure between 2014 and 2015 and reductions in output and net sales associated with declines in apparent U.S. consumption and not cumulated subject imports." Id. at 46-47.

- "underselling did not lead to significant shifts in market shares by value or pieces. . . {P}ricing data showed no clear correlation between cumulated subject imports and the domestic industry's prices. The domestic industry did not face a cost-price squeeze and instead increased its prices for several pricing products over the POI despite the presence of significant volumes of cumulated subject imports that undersold the domestic like product at sizeable margins." Id. at 47.

- The domestic industry "increased its prices for several pricing products over the POI despite the presence of significant volumes of cumulated subject imports that undersold the domestic like product at sizeable margins." Id.

- the record itself "contradicts petitioner's theory that the domestic industry lost sales volume due to cumulated subject import pricing, because during the POI there was no appreciable decline in the domestic industry's market share nor an appreciable increase in the market share for subject imports." Id. at 42-43.

The dynamic found by the Commission regarding pricing is also completely consistent with economic logic. In the classic underselling scenario, domestic pricing and shipment volume decline overtime as price pressure erodes domestic industry market share and exerts downward price pressure. See, e.g., Crystalline Silicon Photovoltaic Cells and Modules from China, Inv. Nos. 701-TA-481, 731-TA-1190, USITC Pub. 4295 at 26-28 (Dec. 2011) (Prelim.) (noting pervasive underselling in 18 of 19 quarterly comparisons, confirmed lost sales and revenue allegations, price decreases in all 4 domestic pricing products and underselling that "allowed subject imports to gain market share at the expense of the domestic industry"). That situation is not occurring in the IMTDC market according to the data collected by the Commission. Instead, as noted above, there were no significant shifts in market share and the domestic industry was able to push through price increases during the POI. See Final Determination at 47 (P.R. 192). The facts before the Commission fully support its conclusion that "cumulated subject imports did not have a significant impact on the domestic industry." Id.

With these findings in hand, the Commission's determination with respect to injury is completely consistent with economic logic.  The legal standard that the Commission examines is whether the domestic industry is injured or threatened with injury "by reason of" subject imports.  19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1).  The second half of this directive is important.  It means that it is not sufficient that evidence on the record shows both a decline in domestic industry performance and the presence of imports in the market to make an affirmative final determination.  The Commission must also find that the subject imports are the cause of the declines.  See Swiff-Train Co. v. United States, __ CIT __, __, 904 F. Supp. 2d 1336, 1346-48 (2013).  Under governing precedent, the Commission must determine (1) whether the unfair imports were a "but-for" cause of injury and (2) "whether the quantum of injury was material or consequential."  Id., __ CIT at __, 904 F. Supp. 2d at 1348 ("{T}he Commission must perform a 'but-for' causation analysis of whether the subject imports materially injured the domestic industry." (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 240 (1989))); see also Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 879 (Fed. Cir. 2008).  The Commission must assess whether the subject imports were a substantial factor in the injury to the domestic industry, as opposed to a merely 'incidental, tangential, or trivial' factor."  Mittal, 542 F.3d at 879 (quoting Nippon Steel Grp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

Here, the Commission considered the record as a whole and did not find evidence that establishes the requisite link to make an affirmative finding.  In making its "economic logic" argument, TB Wood's engages in a selective reading of the record, omitting key facts.  That TB Wood's would have reached a different outcome is obvious.  As set forth below, the Commission's overall decision was supported by substantial evidence and is in accordance with law.

### B. The Commission Adequately Explained its Determination that Subject Imports Did Not Increase Market Share or Shift Market Share Away from Domestic IMTDCs

The second challenge by TB Wood's is that subject imports did not increase their market share or divert market share from domestic IMTDCs. The Commission must examine market share in analyzing the impact of imports of subject imports on domestic producers. See 19 U.S.C. § 1677(7)(C)(iii). But market share or shifts is "but one" factor the Commission must consider and it is not a prerequisite to either an affirmative or negative finding. AK Steel Corp. v. United States, 2016 Ct. Intl. Trade LEXIS 122, at *23-25 (2016). Further, even "significant" import volume and market share does not require an affirmative injury determination. See Mexichem Fluor Inc. v. United States, __ CIT __, __, 179 F. Supp. 3d 1238, 1243 (2016) (upholding Commission's negative determination despite finding significant import volume and market share based on a lack of adverse effects to the domestic industry).

The Commission presented market share in a detailed fashion in the Final Determination, explaining that

> cumulated subject imports' share of apparent U.S. consumption, by value, increased only [█] percentage points between 2013 and 2015, and their market share in interim 2016 was lower than in interim 2015. While cumulated subject imports' market share was generally steady (2013 to 2015) or lower (in interim 2016 than in interim 2015), the domestic industry's market share, by value, increased [█] percentage points between 2013 and 2015 (from [█] percent in 2013 and 2014 to [█] percent in 2015), and was [█] percentage points higher in interim 2016 ([█] percent) than in interim 2015 ([█] percent).

Confidential Views at 53-54 (C.R. 533). The Commission's data revealed that for most of the POI, the ratio of pieces of importers' U.S. shipments of cumulated subject imports to the domestic industry's U.S. production was [████████████████████████████] in 2016. Id. at 54. TB Wood's does not properly acknowledge that the Commission's data on market share show that U.S. producers' U.S. shipments [████████

██████████████████████████████████████] at the end of the POI by value.  See CSR at IV-21 (Table IV-7) (C.R. 521).  Meanwhile, the market share of large diameter subject imports [██████████████████████████████████] by mid-2016.  See id. The data collected by the Commission, therefore, told a consistent story that subject imports had [████████████████] market share over the POI before [████████████████████████] ██████████████████████] of the POI.  Moreover, as a ratio to U.S. production, subject imports held a [███████████████████████████████████] percent share by mid-2016.  See CSR at IV-6 (Table IV-2).  In other words, subject imports [████████████] ratio to U.S. production at the end of the POI than they did at the beginning.  These data provide substantial evidence in support of the Commission's determination.

Even TB Wood's argument regarding the growth of large-diameter subject imports is flawed.  Though it notes that the share of large diameter subject imports [██████████████] 2013 and 2015, Pl. Br. at 12 (Confidential Version), TB Wood's fails to acknowledge that the share of large diameter imports was [██████████████████████████].  CSR at IV-21 (Table IV-7) (C.R. 521).  The data also show that the domestic industry experienced [██████████████████████] ██████████████████████████████████████] from the beginning to the end of the POI.  Id.  Despite the evidence on the record supporting the Commission's finding of a lack of correlation given the lack of market share penetration, TB Wood's nevertheless launches two primary complaints against the Commission's market share finding: (1) data flaws and (2) data coverage.

With respect to flaws in the data, claiming that it did not disagree with the Commission's decision to include all diameters of IMTDCs in the domestic like product, TB Wood's argues that

> having made this decision, and having further determined to collect the shipment
> data that fed into its apparent consumption and market share figures on disparate
> bases, the agency could not simply act as though its apparent consumption and
> market share calculations were based on an apples-to-apples comparison of
> subject and domestic shipments. Rather, it was required to acknowledge the
> disconnect between the data sets, and explain how its approach to calculating
> consumption and market shares was nonetheless reliable.

Pl. Br. at 15 (internal citations omitted).  Any issue with the data lies with TB Wood's alone.  As

the Commission explained,

> Subsequent to filing the petitions, at the request of Commerce and other parties,
> petitioner submitted a series of requests to amend the scope language. As a result,
> the five-paragraph scope in the petitions eventually expanded to 12 paragraphs
> and a table, collectively consisting of more than three single-spaced pages. As
> discussed in more detail below, the Commission's staff continued to work with
> questionnaire respondents to revise and refine their data in accordance with the
> additional scope changes and to remove questionnaire responses from the dataset
> that did not meet the parameters of the revised scope or the corresponding
> domestic like product definition. Thus, similar to the finding in our preliminary
> determinations, <u>multiple revisions to the scope of these investigations resulted in
> challenges in the Commission's collection and analysis of the relevant data</u>.

Final Determination at 4 (P.R. 192) (internal citations omitted) (emphasis supplied).   It is the

Petitioner, and not the Commission, who created any perceived data insufficiency, a fact the

Commission properly recognized.  <u>See</u> <u>id.</u> at 7-8.  TB Wood's could have urged the Commission

to collect data from domestic producers on their large-diameter IMTDCs when it submitted

comments on the draft questionnaires, but it failed to do so.  <u>See</u> Letter on Behalf of TB Wood's

to the Comm'n re: TB Wood's Comments on Draft Questionnaires (June 27, 2016)

(Nonconfidential Version) (P.R. 83).  In fact, TB Wood's puts the burden of collecting such data

on the Commission, despite not having properly raised the issue during the administrative

proceeding.  Pl. Br. at 15 n. 10 (noting that there was no "legal or practical bar to collecting

shipment, value, or other data from the domestic industry specific to large-diameter IMTDCs, as

well as IMTDCs of smaller diameters").

There are several reasons for the Court to reject this argument. First, Plaintiff's arguments regarding the alleged "disconnect between the numerators and denominators of the equation" appear for the first time in its brief to the Court. Id. TB Wood's had an opportunity to address this issue in both its questionnaire comments and briefing before the agency, but did not. As a result, this issue is not properly before the Court and Plaintiff's arguments regarding the impact of this issue on the Commission's analysis should be disregarded. See, e.g., Taian Ziyang Food Co. v. United States, __ CIT __, __, 918 F. Supp. 2d 1345, 1361 (2013) (rejecting arguments made by party at the judicial level where party failed to exhaust administrative remedies during an administrative remand proceeding).

TB Wood's also complains that the import data upon which the Commission relied were insufficient, covering only 40 percent of estimated Chinese imports. Pl. Br. at 15 (citing Final Determination at IV-3). TB Wood's argues that the Commission "does not appear to have further considered whether the lack of data accounting for the majority of imports affected its import and shipment data, and hence its calculation of market shares." Id. at 16. This argument fails for several reasons. For one, the Commission and its staff expressly addressed the data coverage issue, noting that

> A conclusive estimate of the coverage of the importer questionnaires obtained in the final phase of these investigations is complicated by the inclusion of both IMTDCs and non-IMTDC merchandise in the various relevant HTSUS statistical reporting numbers, the large number of potential importers identified by proprietary Customs data, and the diversity of sizes and applications of the product at issue. . . .

Final Determination at 22 (P.R. 192). The agency staff further noted that an estimate of the data coverage was

> complicated by the inclusion of subject and nonsubject merchandise in the various relevant HTS provisions, the large number of potential importers identified by proprietary Customs data (especially compared to the relatively small number of

15

importers identified in the petitions), the diversity of sizes and applications of the product at issue (making it difficult to identify relevant importers by business line or average unit value on imports), and the shifting definition of the imported subject merchandise itself.

Id. at IV-3.   The Commission addressed the issue of data coverage expressly, albeit in the context of TB Wood's request for adverse inferences, explaining

that the detailed description of the product at issue in these investigations and the lack of any publicly available information on this record specific to IMTDC market participants complicated our assessment of questionnaire coverage for the domestic industry, imports from subject and nonsubject sources, and the subject industries in Canada and China.  For these reasons and those discussed in more detail below, we have relied on information available, which includes information submitted and obtained in the preliminary and final phases of these investigations, including questionnaire responses from responding domestic producers, purchasers, importers, and foreign producers of subject merchandise.

Id. at 5.  The Commission also concluded that the volume data demonstrated that "the record does not show any significant market share shift from the domestic industry to subject imports during the POI.  In fact, as measured by value, the domestic industry increased its market share over the POI."   Id. at 41. These numerous statements on data coverage and market share, therefore, belie any argument that the Commission failed to properly consider any alleged data coverage shortfalls.

Second, even considering the extent of data coverage, the Commission's duty, in this respect, is not to ensure that it has full data coverage, but to conduct sufficient analysis of the data properly on the record to support its determinations.  TB Wood's cites a series of cases in support of its contention that the Commission failed to adequately analyze the record.  For instance, TB Wood's cites to Nucor Fastener Div. v. United States, __ CIT __, 791 F. Supp. 2d 1269 (2011), noting that the Court remanded the Commission's decision because its "conclusions did not acknowledge or discuss limits of data relied upon." Pl. Br. at 17.  In Nucor, the Court's remand order centered on a disconnect between what data was collected and how it

was presented by the Commission to support its conclusions.  See Nucor, __ CIT at __, 791 F. Supp. 2d at 1280-87.  The Court was careful to focus on the inadequacy of the Commission's analysis not the record: "{t}his is not to say that ITC must obtain perfect information in order to carry out its statutorily mandated task."  Id., __ CIT at __, 791 F. Supp. 2d at 1284.

In the case now before the Court, the Commission may have imperfect data, but the Commission is not limited to making conclusions only where there is perfect data.  See, e.g., Aluminum Extrusions Fair Trade Comm., 2012 Ct. Intl. Trade Lexis 134, at *29 n. 5.  It is hard to imagine a record that is perfect.  Here, the Commission addressed data collection issues at length in responding to the request by TB Wood's for the application of adverse facts, noting that "{w}e acknowledge that our data coverage for the IMTDC industry in China is uncertain."  Final Determination at 57 (P.R. 192).  In its discussion of this issue, the Commission found that, "{t}o the extent that information on the record concerning the IMTDC industry in China is incomplete, the record does not indicate that the information from any producer of in-scope IMTDCs that did not respond to the Commission's foreign producer questionnaire would have been appreciably different from the information obtained from the responding producers."  Id. at 59.

While TB Wood's might prefer that there were more or different data on the record, the Commission makes its determination based on the record before it and is given significant discretion in weighing that evidence.  See Nevinnomysskiy Azot v. United States, 32 CIT 642, 661, 565 F. Supp. 2d 1357, 1373 (2008); see also Roses, Inc. v. United States, 13 CIT 662, 668, 720 F. Supp. 180, 185 (1989) ("A presumption exists that the Commissioners consider all the evidence in making their determination, and the burden is on the plaintiff to make a contrary showing.") (internal citation omitted).  Additionally, it is settled law that "the burden of creating an adequate record lies with interested parties."  QVD Food Co., Ltd. v. United States, 658 F.3d

1318, 1324 (Fed. Cir. 2011) (quoting Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT

931, 936 806 F. Supp. 1008, 1015 (1992) (alterations in original)).   Here, the "record does not

contain (nor has petitioner provided) publicly available information about the IMTDC industry in

China."  Final Determination at 59 (P.R. 192).   Far from "pretending away" potential issues with

data coverage, the Commission examined data coverage in numerous places in its Final

Determination. Id. at IV-3 (finding data coverage to be at least 55.7 percent for subject

countries); contra Pl. Br. at 16, n. 12.   The coverage was not a simple matter of Chinese

exporters not responding to the questionnaire – the overlapping HTS provisions and scope issues

created by Petitioners had an impact on the data – an impact that the Commission expressly

examined. This Court should find that the Commission properly considered the impact of the

questionnaire data coverage and gave a reasoned explanation for its analysis, thus supporting its

determination with substantial evidence.

The citation to Diamond Sawblades Mfrs. Coalition v. United States, 32 CIT 134 (2008),

also does little to advance Plaintiff's argument.   There, the Court remanded the Commission's

attenuated competition findings on the basis of blade size and channels of distribution after

identifying specific facts in the record that conflicted with the Commission's conclusions.  Id. at

143-46 (concluding, for example, that "the data also indicate that an almost equal proportion of

the U.S. industry was focused on so-called 'midrange' sizes of 10-14" blades. . .").   TB Wood's

fails to point to this type of specific evidence in its challenge to the determination at issue.

Indeed, Plaintiff's central criticism of the Commission's analysis stems from data difficulties

generated by TB Wood's own scope changes.   See Final Determination at 4 (P.R. 192) ("the

Commission's staff continued to work with questionnaire respondents to revise and refine their

data in accordance with the additional scope changes and to remove questionnaire responses

18

from the dataset that did not meet the parameters of the revised scope of the corresponding domestic like product definition."). The suggestion by TB Wood's that the Court remand this case "so that the Court may obtain an explanation from the agency adequate to support judicial review," Pl. Br. at 17, is unwarranted given that the Commission made a proper determination based on the ample record evidence before it and given data difficulties caused by TB Wood's itself.

In any event, TB Wood's utterly fails to indicate how the supposed masking of market share should have led to a different conclusion on injury. Although TB Wood's makes the vague claim that data coverage issues "undermines" the Commission's conclusions, it fails to articulate which specific facts in the record suggest that data coverage of nearly half somehow undercuts the Commission's determinations on market share specifically or the impact of subject imports on the domestic industry generally. Pl. Br. at 16. Although TB Wood's wrongly accuses the Commission of making conclusions based on speculation, TB Wood's offers nothing but speculation as to the possibility of contrary evidence.

Similarly, Plaintiff's citation to Elkem Metals Co. v. United States, 28 CIT 1087, 342 F. Supp. 2d 1207 (2004), is not persuasive due to factual differences. It is true that Elkem held that the Commission must consider the whole record in its underselling analysis, but the situation in Elkem differs significantly from the one now before the Court. Id., 28 CIT at 1105, 342 F. Supp. 2d at 1223. There, the Court examined a scenario where the domestic industry was involved in a price fixing scheme. The Commission did not observe a decline in domestic pricing after the end of the conspiracy and inferred that prices must have been affected by the conspiracy after it had concluded. Id., 28 CIT at 1106, 342 F. Supp. 2d at 1223. The Court found that in the remand redetermination at issue "the ITC neither analyzed factors such as supply and demand that would

function to keep prices up or to drive prices down, nor indicated why an immediate drop would be expected in the context of the business cycle or any other exiting marketplace situation, as it is required to do by statute." Id., 28 CIT at 1097, 342 F. Supp. 2d at 1216.

In the IMTDC investigation, by contrast, the Commission's discussion of the conditions of competition and the business cycle was thorough over the course of six pages. See Final Determination at 30-36 (P.R. 192). The Commission examined such data as end-user demand, domestic and nonsubject supply, purchasing behavior and raw materials costs. Id. Plaintiff's belief that its interpretation of these data is correct does not mean that the Commission did not consider the full record and that, given its thorough review, the agency's determination was unsupported by substantial record evidence or not in accordance with law.

## C. The Commission's Conclusion on Pricing Effects Was Supported by Substantial Evidence and in Accord with Law

TB Wood's next claims that "the ITC's price determination relied on the erroneous market share analysis, as well as unexplained and inadequately supported conclusions regarding the importance of price in purchasing, the relationship between subject and domestic prices, the cost experience of the domestic industry, and the price depressing/suppressing effects of subject imports." Pl. Br. at 10. To evaluate the price effect of subject imports, the Commission "considers{s} whether: (1) there has been significant price underselling by the imported merchandise as compared with the domestic prices for like products; and (2) subject imports have the effect of depressing domestic prices or preventing price increases, that would have occurred otherwise, 'to a significant degree.'" Altx, Inc. v. United States, 26 CIT 1425, 1436 (2002) (citing 19 U.S.C. § 1677(7)(C)(ii)). Mere underselling alone does not support an affirmative finding of injury. Id.

Regarding price, the Commission found that "{p}rices of domestically produced IMTDCs showed no clear trend during the POI, with prices for five products to end users/distributors increasing. . .and price for six products to end users/distributors decreasing. . ." Final Determination at 41 (P.R. 192).  Further, the Commission found that "{t}he domestic industry's prices for some of the pricing products fluctuated significantly throughout the period in ways that cannot be linked to subject imports." Id. at 41-42.  In support of its contention that the Commission's price effects analysis was flawed, TB Wood's focuses its discussion of the record on a tally of instances of underselling and its observation that there was underselling across the pricing data collected by the Commission.  See Pl. Br. at 18.  TB Wood's also recycles its allegation regarding the Commission's market share analysis.  Id. at 20.  A broader examination of the Commission's price effects analysis shows its determination to be supported by substantial record evidence.

### 1. The Commission's Market Share Analysis Was Not Flawed

TB Wood's claims that the Commission's pricing analysis must be remanded due to the allegedly flawed market share analysis.  See id.  For the reasons set forth above, the Commission's market share analysis was based on proper data and a full consideration of the record evidence.

With respect to the market share data collected during the investigation, the Commission found that "the record. . .reveals no significant effects as a result of {price} underselling." Id. at 41.  The Commission further determined that "as measured by value, the domestic industry increased its market share over the POI." Id.  As the Chinese respondents discussed at the hearing, value is a more useful metric for analysis given the high degree of variability in the domestic like product.  See Hearing Tr. at 161 (Grimson) (P.R. 185) ("The economic value of

this market, when counted by dollars, is different apparently then when counted by number of

pieces, and so I think that if you are talking about the condition of an industry, measuring it on a

dollar basis in a case like this, like in saw blades . . . when you have potential product mix issues

with 20,000 SKUs, value's probably a safer way to go.").   Taken as a whole, the record

affirmatively supports the determinations made by the Commission regarding market share.

Plaintiff's desire for a different answer cannot be substituted for the Commission's reasoned

analysis.

> 2. *The Commission's Price Depression Analysis Was Not Inadequately Explained and Supported*

TB Wood's also claims that the agency failed to "acknowledge or discuss record

evidence undermining" its conclusions on price.  Pl. Br. at 20.  But TB Wood's engages in a

selective reading of the record.  For example,

| TB Wood's Claim | Commission's Finding |
|---|---|
| "the record. . .shows a [████████] trend over time for the majority of the U.S-produced products.*"*  Pl. Br. at 21 (Confidential Version) (citing CSR at V-1—V-7, V-29)) (C.R. 521). | "Prices of domestically produced IMTDCs showed no clear trend during the POI, with prices for five products to end users/distributors increasing by margins of [██] percent to [██] percent, and prices for six products to end users/distributors decreasing between [██] percent and [███] percent."  Confidential Views at 58 (C.R. 533). |
| "U.S. prices [█████████] in the last quarter of 2015 than in the first quarter of 2013 for products [████████████████████] and for [████████]."  Pl. Br. at 21 (Confidential Version) (citing CSR at V-1 – V-15 (Tables V-2 – V-7)). | "reported U.S. shipments and prices of the domestic product actually increased over the POI for some pricing products, notwithstanding underselling by comparable or larger volumes of subject imports for those products{,}" citing "trends for pricing products 2 and 3 to end users and distributors. Prices for the domestic like product experienced significant fluctuations even while prices for subject imports remained relatively steady."  Final Determination at 41-42 & n. 218 (P.R. 192). |
| "And while U.S. prices and volumes for these products to this channel [████████] over the POI, subject imports continuously sold [████████].  Pl. Br. at 21 (Confidential | "The domestic industry's prices for some of the pricing products fluctuated significantly throughout the period in ways that cannot be linked to the subject imports. Instead, these fluctuations are consistent with the pricing variability identified by market participants, which reported that prices can vary substantially for the same product depending on factors such as |

| | |
|---|---|
| Version) (citing Confidential Views at V-14 – V-15 (Table V-6 & V-7)). | brand, customer, application, and lead time.   Final Determination at 41-42 (P.R. 192). |

TB Wood's makes much of the Commission's alleged failure to "acknowledge or discuss evidence undermining the agency's conclusions."  Pl. Br. at 20.  But, "{t}he law does not require a written response by the ITC to all points made by parties before it.  A presumption exists that the Commissioners consider all the evidence in making their determination, and the burden is on the plaintiff to make a contrary showing."  Roses, 13 CIT at 668, 720 F. Supp. at 185 (citations omitted).  As the chart above shows, for each alleged oversight the Commission made a reasoned judgment based on affirmative evidence contradicting TB Wood's position.

There is in fact evidence on the record cutting against TB Wood's position and fully supporting the Commission's determination with respect to price effects.  For product 1 sales to distributors, for example, [███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ].  See CSR at V-9 (Table V-2), V-16 (Figure V-3a) (C.R. 521).  Despite the presence of [███████████████████████████ ], there was [██████████████████████████████████████████████████████████████████████████████ ]. Id.  The data on product 2, meanwhile, [█████████████████████████████████████████████████████████████████████████ ].  Id. at V-11, V-18-19 (Tables V-41, V-4b).  For product 3, there are [█████████████████████████████████ ] to both end users and distributors [██████████████████████████████████████████████████████████████████████████████████████████████ ].  Id. at V-12 (Table V-4).  For product 5, sales to distributors, [████████████████████████████████ 

23

NONCONFIDENTIAL VERSION
CONFIDENTIAL INFORMATION DELETED

███████████████████████████████████████████████████████████████████████████████

███████ ]. Id. at V-14 (Table V-6), V-24, (Figure V-7a). For product 6, sales to distributors, the

U.S. product [████████████████████████████████████] between 2013 and mid-2016. Id. at

V-15 (Table V-7), V-26 (Table V-8a). In sum, there is ample evidence that supports the

Commission's determination that the record "reveals no significant effects as a result of this

underselling." Final Determination at 41 (P.R. 192).

The Court should also reject Plaintiff's claim that "{a}s an initial matter, the agency

bases its conclusion on shipments of just two pricing products, to one distribution channel." Pl.

Br. at 21. In reality, in the portion of the Final Determination cited by TB Wood's, the

Commission was simply noting, in the midst of its analysis of all the data, that U.S. shipments

and prices increased "for some pricing products," citing products 5 and 6. Final Determination

at 41 & n. 217 (P.R. 192). TB Wood's fails to note that pricing products 5 and 6 [████████████

██████████████████████████████████████], rendering reasonable the Commission's

special analysis of those two products. It is, therefore, misleading to suggest that the

Commission's analysis was limited to two pricing products to one distribution channel and

therefore somehow flawed.

TB Wood's also argues that the Commission failed to properly recognize that prices for

pricing product 2 and 3 [████████████] POI. Pl. Br. at 21-22 (Confidential Version). As TB

Wood's itself acknowledges, however, product 2 was [███████████████████] of all pricing

products. Id. In 2013, a [█████████████████████████████████████████████

██████ ]. Id. at Attach 1 (Confidential Version) (citing CSR at Table V-3). Sales to end users [████

████████████████████████████████████████████ ]. Id. In any event, as noted above,

[██████████████████████████████████████████████████████████████████████████



■ ]. CSR at V-11, V-18-19 (Tables V-41, V-4b) (C.R. 521). The [■

■ ]. Id. Data covering such [■ ] quantities cannot

reasonably doom the Commission's entire pricing analysis. Especially when considering that

pricing products 5 and 6 [■

■ ]. See id. at V-14-V-15 (Table V-6 and V-7) (showing quantities

sold in each quarter of the POI).

TB Wood's further argues that the fungibility of the domestic and imported merchandise

somehow undermines the Commission's conclusions. See Pl. Br. at 22. Fungibility actually

lends support to the Commission's determinations. To oversimply, the Commission is presented

with a scenario where two products persist in the market at different prices. If product A and

product B are identical and compete directly based on price alone, classical economic theory

instructs that the price points will converge and based on the acumen and other inherent

advantages of the two producers one or the other will gain market share until the market is

captured. But that is not what data show in this case. The Commission is, therefore, left to

conclude that there is some other factor having an impact on competition between the two sets of

merchandise. It could be poor business choices made by one or the other producer, non-subject

imports or any number of other factors, but once the causal link between subject import pricing

and the condition of the domestic industry is broken, the Commission must find no injury.

The mere fact of underselling is not sufficient to find injury. See Altx, Inc. v. United

States, 26 CIT 709, 723 (2002). "That there was frequent underselling during the POI does not

necessarily mean that underselling was the source of injury. The overall frequency of

underselling by itself says nothing about causation, and does not absolve the Commission of its

obligation to analyze underselling in terms of trends in the domestic industry's performance."

Id.  Moreover, "{e}vidence of consistent underselling that occurs while the domestic industry is performing favorably may reasonably undercut the significance attributed to underselling." Altx, Inc. v. United States, 25 CIT 1100, 1110, 167 F. Supp. 2d 1353, 1366 (2001).  Because underselling alone does not prove causation, the Commission must examine other factors.  Id., 25 CIT at 1106, 167 F. Supp. 2d at 1362 (noting the importance of other factors in analyzing the causal link between subject imports and any harm suffered by the domestic industry).  Here, among other factors at issue were lower raw material costs and lower demand.  See Final Determination at II-10-11 (citing lower demand for IMTDCs), V-3 (citing reported reductions in raw material costs) (P.R. 192).  These are alternate causes for the inability of the domestic industry to raise prices.  The Commission properly considered both underselling and other factors in light of record evidence to make a reasoned conclusion as to the pricing data.

The Commission has a broad and varied record before it in this and all investigations. The Court's role in reviewing the agency's determinations is not to substitute its judgement regarding the data, but to ensure that the Commission has considered the data and made a reasoned analysis.  Usinor, 28 CIT at 1111, 342 F. Supp. 2d at 1272.  The Commission has met its burden of reviewing all the data on the record – through its discussion and tabulation of record evidence on underselling – and reaching a reasoned conclusion.  There is no reason for this Court to substitute its judgment for that of the Commission.

      *3.   The Commission's Price Suppression Analysis Was Not Inadequately Explained and Supported*

Plaintiff's challenge to the Commission's price suppression determination centers on a narrow discussion of the domestic industry's cost of goods sold (COGS) to net-sales ratio, but TB Wood's fails to link these economic headwinds to subject imports or provide a full rendering of the record.  See Pl. Br. at 23-24.  TB Wood's also makes allegations regarding the deficiency

of the Commission's analysis in light of the domestic industry's SG&A costs, claiming that "any price increases experienced by an industry are not meaningful by themselves, but only in the context of costs." Id. at 23.

Contrary to the argument that the Commission failed to consider key data, the Commission found that from the beginning to the end of the POI, the ratio of COGS to net sales [███████████████████████████████████████████████], "the increase in the COGS to net sales ratio in 2015 occurred as apparent U.S. consumption declined" and that the ratio was [████] in interim 2016 than in interim 2015. Confidential Views at 59 (C.R. 521). The data do not indicate any [██████████████] in gross income. In addition, SG&A costs increased during the POI, cutting into the industry's profits for reasons wholly unrelated to the subject imports. Final Determination at 46 (P.R. 192). These conclusions further support the reasonableness of the Commission's conclusion that the COGS to net sales ratio was not evidence of price suppression. Id. at 42.

The Commission found that there was no price suppression largely on the basis of observable price increases, but also discussed changes in the domestic industry's cost structure. Id. at 42. TB Wood's does not grapple with such evidence, such as the information showing that price increases were occurring even as raw materials costs were falling:

| | Input | June 2014 ($/ton) | June 2015 ($/ton) | June 2016 ($/ton) | Percent Decrease | |
|---|---|---|---|---|---|---|
| [ | ███████████ | ████ | █████ | █████ | ██████ | ] |
| [ | ██████ | ██ | ███ | ███ | █████ | ] |

See Powermach Pre-Hearing Br. at 15 (Confidential Version) (C.R. 473) (citing Int'l Trade Comm'n, Confidential Release Doc. ID 591513 (released Sept. 28, 2016) (C.R. 468)).  In the

context of [████████████████████████], there can be no cost price squeeze. <u>See</u>
<u>generally</u> Final Determination at 47 (P.R. 192) ("The domestic industry did not face a cost-price
squeeze. . . ").

While TB Wood's posits its own potential explanation for this trend, claiming that the
industry was forced out of the small-diameter market first, the Commission discounted this very
argument when TB Wood's "was unable to . . . corroborate these allegations."   Final
Determination at 42 (P.R. 192).  Additionally, as discussed above, TB Wood's is a [████████
████] in the industry and its specific experience may [████████████] with that of other
domestic industry participants.   TB Wood's also criticizes what it calls the Commission's
"tautology" that non-subject goods are non-subject, but fails to identify how the Commission can
reach beyond the data in the record.  Pl. Br. at 28.   Through its citation to the <u>Diamond</u>
<u>Sawblades</u> remand, TB Wood's essentially asks the Commission to abandon its statutory
mandate and consider within the domestic like product merchandise that was excluded from the
scope of the Department of Commerce's investigation and posit how that merchandise, for which
it has no data, might bear on the domestic industry's condition.  <u>See</u> Pl. Br. at 28 n. 23.   In
<u>Diamond Sawblades</u>, the Commission found that "U.S. and subject imports of finished diamond
sawblades competed in each size category throughout the POI."  <u>Diamond Sawblades and Parts</u>
<u>Thereof From China and Korea</u>, Inv. Nos. 731-TA-1092-1093, USITC Pub. 4007 at 10 (May
2008) (Final) (Remand).   Plaintiff's citation to this case is irrelevant given that the subject
merchandise in this investigation does not include small-diameter IMTDCs, whereas the
<u>Diamond Sawblades</u> case involved subject merchandise in many different size categories.   TB
Wood's also fails to mention that [████████████████████████████████████
████]."  Confidential Views at 60 n. 225 (C.R. 521).  If TB Wood's wanted the Commission to

review the injury caused by large and small diameter IMTDCs it should have framed its case on that basis.

The Court should also dismiss TB Wood's attempt to cast doubt on the reasonableness of the Commission's conclusions based on the data provided by purchasers regarding the switch from domestic goods to subject merchandise.  Pl. Br. at 27.  Although TB Wood's notes that the evidence showed "that the majority of purchasers switched from U.S. to subject IMTDCs during the POI, that most of these purchasers reported that subject IMTDCs were lower-priced than the domestic like product, and that many of them also identified these lower prices as a reason for their shift," id., it omits that [███████████████████████████████████████████ ███████████████████████████████████████████████████████].  CSR at V-31-33, Table V-11 (C.R. 521).  Based on these data, the Commission properly concluded that "the reported quantity of {shifts to subject imports} was small relative to apparent U.S. consumption, and the record as a whole does not show that the domestic industry lost market share to subject imports."  Final Determination at 41 n. 215 (P.R. 192).

In short, Plaintiff's arguments paint an incomplete picture of the record evidence.  At best, they represent an alternative view but the law requires that the Commission's conclusion be based on substantial evidence, not that it is the only conclusion the record may support.  The Commission's analysis was based on a thorough review of pricing data, market share, the financial health of the domestic industry and the confluence of these factors.  TB Wood's has not given any reasonable basis for this Court to disturb the Commission's findings.

### D.  The Commission Properly Explained its Conclusions Regarding Impact

The Court should also reject Plaintiff's argument that the Commission failed to adequately explain or support its conclusion regarding the impact of the subject imports on the

domestic industry on the basis of (1) inadequate market share and pricing analyses, (2) failure to acknowledge record evidence that undermined its conclusion regarding the impact of consumption and costs changes on domestic industry performance and (3) post-petition effects. See Pl. Br. at 31.

While the Commission "must address significant arguments and evidence which seriously undermines its reasoning and conclusions" it is not "required to explicitly address every piece of evidence presented by the parties, and . . . is presumed to have considered all of the evidence on the record." U.S. Steel Corp. v. United States, __ CIT __, __, 856 F. Supp. 2d 1318, 1321 (2012) (internal citations omitted).  Plaintiff's argument that the agency failed "to explain or support its finding that demand and cost trends fully explain the U.S. IMTDC industry's poor condition over the POI, either as matter of the record or as a matter of logic" mistakes the Commission's task when analyzing impact.  Pl. Br. at 10.  The Commission's duty is not to determine whether "domestic industry performance was fully attributable to demand and cost trends," but to test whether any retreat in the domestic industry's financial indicators is by reason of subject imports.  Compare Pl. Br. at 34, with 19 U.S.C. § 1673d(b)(1).  Essentially, TB Wood's asks the Commission to analyze the data and explain why the domestic industry has performed poorly.  That is not the Commission's role in trade remedy proceedings.

The Commission examined the record and identified certain exogenous factors, other than subject imports, that in its expert opinion were sufficient to break the causal link between subject imports and domestic industry performance.  See Final Determination at 44-47 (P.R. 192) (noting among others employment factors, productivity declines, increasing R&D spending). The Commission, taking the record as a whole, concluded that "the record indicates a relationship between unfavorable changes in the industry's cost structure between 2014 and 2015

and reductions in output and net sales associated with declines in apparent consumption and not cumulated subject imports." <u>Id.</u> at 46-47.

TB Wood's nevertheless argues that the data do not support the Commission's impact determination.  For one, TB Wood's cites an [███████] in the industry condition over the interim period as proof that some other factors besides declining demand and increasing costs were having an impact on pricing during the POI.  Pl. Br. at 30-33 (Confidential Version). Specifically, TB Wood's contends that "subject imports that pervasively undersold the domestic like product affected the domestic industry's ability to [███████████████]." <u>Id.</u> at 33.  TB Wood's does not cite evidence from the POI itself to support its theory and ignores important constraints of the dataset collected by the Commission.  In an industry with such a varied product mix, reliance on per-unit-values is problematic because the value can differ based on size and composition of the product.  <u>See, e.g., id.</u> at 34.  This makes apples-to-apples comparisons difficult.  The use of per-unit data as a measure of performance is further complicated by the fact that volume in this case was measured in pieces, rather than an absolute figure like kilograms.  This factor introduces the potential that changes in per-unit data that TB Wood's cites are merely a result of product mix issues and inherent data limitations that are no fault of the Commission, contrary to Plaintiff's argument.

Data on the record reflect a number of factors that could be driving the trends identified by the Commission in making its impact determination.  In addition to the theory presented by TB Wood's, changes in labor and cost structure are potential factors identified by the Commission.  Between interim 2015 and interim 2016, the Commission found that SG&A expenses [███████], the numbers of workers [███████] and wages paid [███████], all while productivity [███████].  <u>See</u> CSR at C-3 (Table C-

1) (C.R. 521).  Labor and cost factors suggest that sales may have shifted to [████████]
IMTDCs contributing to [████████████████████████] per-unit profit.  Id.  The data may
also indicate an industry that is finally recalibrating to a new demand picture.  The Commission
examined all of this record evidence and determined that improvements during the interim period
were due to "a decrease in the domestic industry's COGS, not an increase in domestic shipments
as a result of any retreat from the market by cumulated subject imports."  Final Determination at
47 (P.R. 192).

In seeking to find fault with the Commission's impact determination, TB Wood's also
fails to acknowledge the [███████] presence of nonsubject imports in the market.  Court
precedent mandates that the Commission not attribute injury from nonsubject imports to subject
imports,[4] and the agency properly did so in this case.  If it is the case, as TB Wood's suggests,
that [████████] between interim 2015 and interim 2016 were due to a retreat of imports
from the market and IMTDCs are generally interchangeable, then the [████████████] in
nonsubject imports is difficult to square with TB Wood's presentation of this issue.  See Pl. Br.
at 34 (Confidential); see also Final Determination at II-10 (P.R. 192) (of purchasers with
knowledge of imports from China, Canada, Mexico and other nonsubject countries, 11 of 23
respondents said they never make a purchasing decision on country and a further nine indicated
that they only sometimes make a choice on that basis.).  Between interim 2015 and interim 2016,
U.S consumption [████████████████████].  CSR at C-3 (Table C-1) (C.R. 521).  Yet,
during the same period, subject imports of large diameter IMTDCs declined 25.8 percent while
nonsubject imports of large diameter IMTDCs actually increased market share.  Final

---

[4]  Mittal Steel, 542 F.3d at 877; see also Bratsk Aluminum Smelter v. United States, 444 F.3d
1369, 1379 (Fed. Cir. 2006) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 722
(Fed. Cir. 1997)).

NONCONFIDENTIAL VERSION
CONFIDENTIAL INFORMATION DELETED

Determination at C-3 (Table C-1) (P.R. 192).  The result was a market share swing [██████

████████████ ].  Id.  While TB Wood's advances certain facts to support its theory as to

why the domestic industry may have experienced declines during the POI, the Commission is

bound to consider the record as a whole, including the role of nonsubject imports.  Plaintiff's

own arguments do not address this key factor.

The Court's charge is to find whether the agency's determination was supported by

substantial evidence and adequately explained.   Again, the Commission is not required to

address every piece of evidence on the record.  U.S. Steel, __ CIT at __, 856 F. Supp. 2d at 1321.

Plaintiff's incomplete rendering of the facts and conclusions of the Commission do not provide a

reasonable basis to displace the agency's reasoned analysis on impact.  The Commission has met

its burden.

### E. The Commission's Threat Determination Was Supported by Substantial Evidence and in Accordance with Law

Finally, TB Wood's claims that "the ITC found no threat of material injury to the

domestic industry, based on its erroneous earlier findings with regard to market share, price, and

impact, and otherwise failed to acknowledge or discuss material evidence that contradicted its

threat findings."  Pl. Br. at 10.  TB Wood's argues that the Commission did not properly weigh

evidence regarding ongoing export capacity in Canada, did not give adequate weight to inventory

overhang and a renewed discussion of the market share issue.  See id. at 36-42.  The Court must

reject these arguments because the Commission properly weighed the evidence and found no

imminent threat to the domestic industry by reason of Canadian or Chinese IMTDCs.

The statute directs the Commission to determine whether an industry in the United States

is threatened with material injury by reason of the subject imports by analyzing, among other

factors, whether "further dumped or subsidized imports are imminent and whether material

injury by reason of subject imports would occur unless an order is issued. . ."  19 U.S.C. §§ 1673d(b)(1), 1677(7)(F)(ii); see also Prestressed Concrete Steel Wire Strand from China, Inv. Nos. 701-TA-464 and 731-TA-1160, USITC Pub. 4086 at 12 (July 2009) (Prelim) ("PC Strand from China").  The Commission may not make such a determination "on the basis of mere conjecture or supposition," and considers the threat factors "as a whole."  PC Strand from China at 12. "The statute requires a causal link between a threat of material injury finding and subject imports."  Celanese Chems. Ltd. v. United States, 31 CIT 279, 313 (2007); see also Comm. for Fair Beam Imps. v. United States, 27 CIT 932, 961 (2003) ("As the statute requires a causal link between a threat of material injury finding and subject imports, § 1673d(b)(1), and as the record establishes a number of favorable conditions pertaining to the domestic industry, the court cannot say that the majority of the Commissioners' treatment of the domestic industry's adverse trends was unreasonable and factually unsupportable.").

TB Wood's has not identified specific record evidence that the Commission failed to consider but instead disputes how the Commission weighed the evidence.  With respect to Baldor's move south to Mexico, TB Wood's argues that while Baldor's finishing operations moved, casting capacity in Canada was unaffected. See Pl. Br. at 36-37.  The Commission affirmatively addressed this issue stating that they rejected TB Wood's "contentions as speculative for several reasons."  Final Determination at 50 (P.R. 192).  Those reasons included questionnaire data showing "no indication that another firm in Canada will export meaningful volumes of unfinished or finished IMTDCs to the United States in the imminent future."  Id. at 51 (citing testimony by a TB Wood's witness characterizing the potential for future Canadian exports as "speculation.").  In addition, the Commission cited evidence submitted by TB Wood's regarding Laforo Iron Foundry that tended to undermine the suggestion that there is significant

residual capacity for subject merchandise in Canada.  Id. at 52.  The agency also analyzed

questionnaire responses and found evidence of "difficulty sourcing blanks within Canada."  Id. at

52-53.  Based on the robust factual evidence underlying the Commission's determination, there

are no grounds for Plaintiff's suggestion that the Commission failed to adequately explain its

position on cumulation or negative threat finding with respect to Canada.  TB Wood's has not

identified evidence that would suggest that the Commission's interpretation of the evidence is

unreasonable with respect to residual export capacity in Canada and, by extension, its

determination regarding cumulation.

Plaintiff's arguments regarding the threat of injury posed by China suffer from the same

deficiencies.  TB Wood's claims that the Commission failed to adequately consider data

coverage issues, [████████████████████] and arranged imports.  Pl. Br. at 39-41

(Confidential Version).  With respect to data coverage, the Commission noted that it has data

from the two largest firms in the Chinese industry and found that "{t}o the extent that the

information on the record concerning the IMTDC industry in China is incomplete, the record

does not indicate that the information from any producers of in-scope IMTDCs that did not

respond to the Commission's foreign producer questionnaire would have been appreciably

different. . ."  Final Determination at 59 (P.R. 192).  The Commission had 40 percent data

coverage for Chinese imports and 55.7 percent for all subject imports.  Id. at IV-3.  Although

imperfect, the data coverage is significant.

TB Wood's faults the Commission's decision not to apply adverse facts available based

on the perceived incomplete response rate of Chinese exporters and suggests that the

Commission failed to address a potential gap in the record.  Pl. Br. at 40-41.  Plaintiff's citation

to Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003), does little to

support its position that the Commission "must" use facts available to fill the alleged gap.  See Pl. Br. at 40.  The Nippon Steel case examined a proceeding before the Department of Commerce where a mandatory respondent failed to act to the best of its ability with respect to certain data requested by the Department of Commerce.  Nippon, 337 F.3d at 1378.  The purpose of data collection at the Department of Commerce is fundamentally different from that conducted by the Commission.  The Department of Commerce seeks to identify the specific level of dumping or subsidization from a particular company.  See 19 U.S.C. §§ 1671, 1673.  The primary source of much of the information collected by the Department of Commerce is the company itself.[5]  The Commission, by contrast, examines the data collected from numerous sources from across the U.S. and foreign industries.

Here, as the Commission explained, it had sufficient data to perform its required analysis in this case: "we have relied primarily on the data from the responding foreign producers as supplemented with other available record evidence, as the facts available concerning the subject industry in China."  Final Determination at 59 (P.R. 192) (emphasis supplied).  Additionally, Plaintiff's suggestion that the Commission's efforts to gather the data were insufficient lacks support in the record.  Pl. Br. at 40-41.  After all, the Commission went to great lengths to collect data, issuing 61 foreign producer questionnaires after TB Wood's identified only 31 firms in the petition.  See Final Determination at 57 (P.R. 192).  TB Wood's also fails to engage with the issue of how scope changes may have frustrated the Commission's data collection efforts, specifically how exclusions added through the course of the Department of Commerce's investigation significantly changed the picture of the Chinese industry developed during the

---

[5] See Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1336 (Fed. Cir. 2002).

preliminary phase.  Id. at 4-5.  These factors show that the Commission made a reasonable use of

its discretion regarding the application of adverse facts available.

With respect to the substantive elements of the Commission's threat determination, TB

Wood's argues that the Commission failed to consider that "Chinese producers' [███████

████████████████████████████], putting greater export pressure on Chinese producers."

Pl. Br. at 40 (Confidential Version).  As discussed below, the record suggests, however, that any

diversion of capacity [██████████████] the United States.  The Commission concluded that

"{e}ven though the industry in China has the ability to export significant volumes of subject

merchandise to the United States, exports to the United States accounted for a declining share of

total shipments by the industry in China (less than one-third).  Consistent with this trend, the

value of U.S. shipments of subject imports from China declined overall during the POI. . . ."

Final Determination at 56 (P.R. 192).  The data before the Commission show that in [████

████████████████████████████████████████████████████████████

██████████].  CSR at VII-14 (Table VII-6) (C.R. 521).  Similarly, the record shows that

[██████████████████████████████████████████████████████████████].

Id.  At the same, time export shipments to other markets [███████████████████

████████████████].  Id.  By value, [████████████████████████████

████████████████████████████████████████████████████████████

██████████].  Id. at C-3 (Table C-1).  In addition, the Commission found that Chinese industry

has steadily increased its exports to third countries: "Chinese producers' reported shipments to

third-country markets increased markedly over the period, rising from [████] percent of total

shipments in 2013 to [████] percent in 2015, as shipments to the United States and the Chinese

home market declined."  Id. at II-6.  The Commission also noted that "{e}xport shipments to the

United States were about [██] percent of total shipments in 2013 and 2014, declining to [██]

percent in 2015."  Id. at II-7.  Even in the interim period, shipments to the U.S. [████████

████████████████████████████████].  Id. at VII-14 (Table VII-6).  Other markets identified by

Chinese producers were Europe, Canada, Australia, Asia, Africa and the Middle East.  Final

Determination at II-6 (P.R. 192).   Further, as counsel for Powermach noted during the hearing

before the Commission, "there's no suggestion that that excess capacity is going to be directed at

the United States necessarily.  So just because the market's declining in China doesn't lead you

to needing to automatically conclude that there's threat in China."  Hearing Tr. at 162 (Grimson)

(P.R. 185).

 Looking at the home market in isolation in advancing its threat argument is a

misreading by TB Wood's of the record and does nothing to undermine the validity of the

Commission's threat analysis.  Based on the forgoing data, the Commission ultimately concluded

that "there is no basis to conclude that the likely significant volume of subject imports from

China. . .is likely to increase significantly in the imminent future" given "available information

about the behavior of subject imports from China between January 2013 and June 2016. .

.including that subject imports from China maintained a relatively stable share of the U.S.

market. . .accounted for a declining share of the Chinese industry's total shipments of IMTDCs

(less than one-third)" and "capacity was also relatively stable during the POI."   Final

Determination at 59-60 (P.R. 192).  This conclusion was reasonably drawn from the data on the

record and TB Wood's provides no reasonable basis to disturb the agency's determination.

 In its threat analysis regarding price effects, the Commission properly found that "subject

imports from Canada and China did not have significant price effects, given the absence of any

significant market share shifts or evidence indicating that cumulated subject imports depressed

prices of the domestic like product or prevented increases in prices of the domestic like product

that otherwise would have occurred to a significant degree." Id. at 60.  TB Wood's claims that

"the agency's analysis of price effects and impact for threat relies entirely on its earlier,

unexplained and unsupported conclusions regarding present price effects and impact.  For this

reason alone, the agency's threat determination regarding China should be remanded."  Pl. Br. at

39.  For the reasons set forth above, the Commission's overall findings on price were supported

by substantial evidence and in accordance with law.   What's more, it is common for the

Commission to reference its overall injury findings on price in analyzing whether to make an

affirmative determination on threat.  See, e.g., Hardwood Plywood from China, Inv. Nos. 701-

TA-490, 731-TA-1204, USITC Pub. 4434 at 26-30 (Dec. 2013) (Final) (noting, in making

negative threat determination, numerous determinations made in the main injury section of the

Commission's analysis).

TB Wood's further alleges that the Commission's analysis of threat failed to consider the

role of existing inventories and arranged imports.  Pl. Br. at 41.  TB Wood's points to facts that it

alleges undermine the Commission's determination that Chinese imports are not sizeable.   Id.

Plaintiff's arguments, however, present only snapshots and fail to contextualize these data points.

This is a fatal failing given that threat, unlike injury, is primarily a prospective determination and

it inherently driven by trends, rather than static data.   The record shows that inventories of

Chinese subject merchandise held by U.S. importers [█████████████] throughout the POI,

with inventory of imports from China [██████████████████████].  CSR at C-3

(Table C-1) (C.R. 521).   On an absolute basis, inventories of subject imports from China were

[████████████████████████████████]. Id.[6] Plaintiff's reliance on interim period numbers is distortive. See Pl. Br. at 41. Full POI data reflect the complete arc of a business cycle, while the interim period may not reflect the full business cycle for inventories. After all, the Commission's data show that inventories may be [██████████]. CSR at C-3 (Table C-1) (C.R. 521) (showing [████████████████████████████████████████ ██████████]). All of these data support the Commission's determination that "subject imports from China are not likely to have a significant impact on the domestic industry in the imminent future." Final Determination at 61 (P.R. 192).

It is also not true, as TB Wood's contends, that the Commission failed to "mention" importers' inventory trends. Pl. Br. at 41-42. In its report, the Commission expressly noted that "{e}nd-of-period inventories in China and U.S. importers' end-of-period inventories were relatively stable" and set forth the exact level of inventories for each year of the POI, data that showed [████████████████████████████████████████████ ██████████]. Confidential Views at 81 n. 297 (C.R. 533). The Commission thereafter concluded that it did not "find that there is likely to be a significant increase in {subject} imports" noting that "{w}e base this conclusion on available information about the behavior of subject imports from China. . . discussed above." Final Determination at 59 (P.R. 192) (emphasis supplied).

Once again with respect to its attack on the Commission's threat analysis, TB Wood's has identified a narrow set of facts that support its theory, but has not demonstrated that the Commission failed to make a reasonable determination based on the record as a whole. That is the relevant standard, not whether there is any evidence the might detract from the Commission's

---

[6] This figure was calculated by dividing the quantity of U.S. importers' U.S. shipments of imports from China (ending inventory quantity) by the total U.S. consumption.

position.   The Court in turn must examine whether the Commission drew a reasonable determination from the evidence.  The agency has done so with respect to threat.

## VII.   ADOPTION OF ARGUMENTS MADE BY COMMISSION IN SUPPORT OF ITS NEGATIVE DETERMINATION

The China Chamber of International Commerce's ad hoc Coalition of Producers and Exporters of Certain Iron Mechanical Transfer Drive Components from the People's Republic of China and Powermach Import & Export Co., Ltd. (Sichuan) adopt and incorporate by reference the arguments made by the Commission in its response brief to the extent they do not conflict with the above arguments.

## VIII.   CONCLUSION

The Final Determination was supported by substantial record evidence as explained in a well-reasoned written determination.  For the forgoing reasons, the Court should deny Plaintiff's motion for judgment on the agency record and affirm the Final Determination in full.

Respectfully submitted,

Dated: October 16, 2017

/s/ Jeffrey S. Grimson
Kristin H. Mowry
Jeffrey S. Grimson
Jill A. Cramer
James C. Beaty
Bryan P. Cenko*
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to China Chamber of International Commerce's ad hoc Coalition of Producers and Exporters of Certain Iron Mechanical Transfer Drive Components from the People's Republic of China and Powermach Import & Export Co., Ltd. (Sichuan)*
*Admitted in Maryland. Practice directly supervised by principals of the firm admitted to D.C. bar.

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures, as modified by the joint scheduling order in this case. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 13,150 words.


Dated: October 16, 2017

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to China Chamber of International
Commerce's ad hoc Coalition of Producers
and Exporters of Certain Iron Mechanical
Transfer Drive Components from the
People's Republic of China and Powermach
Import & Export Co., Ltd. (Sichuan)*