NONCONFIDENTIAL

---

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE TIMOTHY C. STANCEU, CHIEF JUDGE

_____

Consol. Court No. 17-00022

_____

T.B. WOOD'S INCORPORATED,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

CHINA CHAMBER OF INTERNATIONAL COMMERCE'S AD HOC COALITION OF PRODUCERS AND EXPORTERS OF CERTAIN IRON MECHANICAL TRANSFER DRIVE COMPONENTS AND POWERMACH IMPORT & EXPORT CO., LTD. (SICHAUN),

*Defendant-Intervenors*.

---

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S MEMORANDUM IN OPPOSITION TO PLANITIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

---

**BRIAN SOISET**
**Attorney for Defendant**
**Office of the General Counsel**
**U.S. International Trade Commission**
**500 E Street, SW**
**Washington, DC  20436**
**Telephone (202) 205-3399**

**DOMINIC L. BIANCHI**
**General Counsel**
**Telephone (202) 205-3061**

**ANDREA C. CASSON**
**Assistant General Counsel**
** for Litigation**
**Telephone (202) 205-3105**

# TABLE OF CONTENTS

**Page**

I.   STATEMENT PURSUANT TO RULE 56.2 .................................................... 1

   A.   Administrative Determination Sought to be Reviewed ......................... 1

   B.   Questions Presented and Summary of Argument .................................. 1

      1.   Did Plaintiff Waive a Challenge to the Commission's
         Analysis of Apparent U.S. Consumption and Market Shares?................... 1

      2.   Is the Commission's Analysis of Apparent U.S.
         Consumption and Market Shares Reasonable and in
         Accordance With Law?................................................................... 2

      3.   Are the Commission's Findings that Subject Imports had
         Neither Significant Price Effects nor Significant Impact on
         the Domestic Industry Supported by Substantial Record
         Evidence and Otherwise in Accordance With Law? ................................. 4

      4.   Are the Commission's Respective Threat Analyses of
         Subject Imports from Canada and China Supported by
         Substantial Record Evidence and Otherwise in Accordance
         With Law?................................................................................. 4

II.  STATEMENT OF FACTS ......................................................................... 6

   A.   The Evolution of the Scope of Investigations and Corresponding
      Impact on the Commission's Data Collection ......................................... 6

   B.   Present Material Injury Analysis ........................................................ 7

   C.   Threat of Material Injury Analysis ..................................................... 10

III. STANDARD OF REVIEW ...................................................................... 12

IV.  ARGUMENT ......................................................................................... 14

   A.   The Commission's Calculation of Apparent U.S. Consumption and
      Market Share Is Reasonable and in Accordance With Law .................... 14

      1.   Plaintiff Failed to Exhaust Its Administrative Remedies......................... 15

      2.   The Commission's Calculation of Apparent U.S.
         Consumption and Market Shares Is Reasonable, Supported
         by Substantial Evidence, and In Accordance With Law......................... 20

      3.   The Commission Considered All of the Relevant Record
         Evidence and Reasonably Found that Subject Imports Did
         Not Take Market Share from the Domestic Industry............................... 23

**TABLE OF CONTENTS CONT'D**

B.    The Commission's Analysis of Present Material Injury Is
Supported by Substantial Record Evidence and in Accordance
With Law ................................................................................................ 28

    1.    The Commission's Findings on Price Depression Are
Supported by Substantial Record Evidence and in
Accordance With Law .............................................................. 29

    2.    The Commission's Findings on Price Suppression Are
Supported by Substantial Record Evidence and in
Accordance With Law .............................................................. 31

    3.    The Commission's Impact Findings Are Supported By
Substantial Record Evidence and In Accordance With Law .................... 34

    4.    The Commission's Conclusions on the Lack of a Causal
Link Are Supported by Substantial Record Evidence and
In Accordance With Law .......................................................... 37

C.    The Commission's Threat Analysis Was Supported by Substantial
Record Evidence and In Accordance with Law ...................................... 39

    1.    The Commission Acted Within Its Discretion In Not
Cumulating Subject Imports from Canada and China for Its
Threat Analysis ........................................................................ 39

    2.    The Commission's Negative Threat Determination
Regarding Subject Imports from Canada Was Supported
By Substantial Record Evidence and Otherwise In
Accordance With Law .............................................................. 41

    3.    The Commission's Negative Threat Determination
Regarding Subject Imports from China Was Supported By
Substantial Record Evidence and Otherwise In Accordance
With Law .................................................................................. 42

V.    CONCLUSION........................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Ludlum Corp. v. United States*,
   287 F.3d 1365 (Fed. Cir. 2002)..................................................................................37

*Altx, Inc. v. United States*,
   26 CIT 1425 (2002), *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004)....................................39

*Ceramica Regiomontana, S.A. v. United States*,
   10 CIT 399, 636 F.Supp. 961 (1986), *aff'd*, 810 F. 2d 1137 (Fed. Cir. 1987) .......14

*Coal. of Gulf Shrimp Indus. v. United States*,
   71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ..........................................................13

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)..................................................................................................12

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
   216 F.3d 1027 (Fed. Cir. 2000)...........................................................................26, 43

*Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082,
   1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000) ...........................................14

*Grupo Indus. Camesa v. United States*,
   85 F.3d 1577 (Fed. Cir. 1996)..................................................................................13

*Imperial Sugar Co. v. United States*,
   181 F. Supp. 3d 1284 (Ct. Int'l Trade 2016) .........................................................13

*Int'l Imaging Materials, Inc. v. U.S. Int'l Trade Commission*,
   30 C.I.T. 1181 (2006) ...............................................................................................21

*Jacobi Carbons AB v. United States*,
   222 F. Supp. 3d 1159 (Ct. Int'l Trade 2017) .........................................................13

*JMC Steel Grp. v. United States*,
   70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ...........................................................13

*LG Elecs. v. United States Int'l Trade Commission*,
   26 F.Supp.3d 1338 (Ct. Int'l Trade 2014) .............................................................22

*Mittal Steel Point Lisas Ltd. v. United States*,
   542 F.3d 867 (Fed. Cir. 2008)..................................................................................38

# TABLE OF AUTHORITIES CONT'D

*Nevinnomysskiy Azot v. United States*,
32 CIT 642, 565 F. Supp. 2d 1357 (2008) ......................................................13, 14

*Nippon Steel Corp. v. Int'l Trade Comm'n*,
345 F.3d 1379 (Fed. Cir. 2003)......................................................................38

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006)................................................................13, 14

*NSK Corp. v. United States*,
32 CIT 966, 577 F. Supp. 2d 1322 (2008) ...............................................14

*Nucor Fastener Div. v. United States*,
791 F. Supp. 2d 1269 (Ct. Int'l Trade 2011) ...............................................15, 20

*Sandvik Steel Co. v. United States*,
164 F.3d 596 (Fed. Cir. 1998)..................................................................15, 31

*Shandong TTCA Biochemistry Co. v. United States*,
774 F. Supp. 2d 1317 (Ct. Int'l Trade 2011) ...........................................14

*Siemens Energy, Inc. v. United States*,
992 F.Supp. 2d 1315 (Ct. Int'l Trade 2014), *aff'd* 806 F.3d 1367
(Fed. Cir.2015)............................................................................................14

*Swiff-Train Co. v. United States*,
793 F.3d 1355 (Fed. Cir. 2015).................................................................38

*Timken U.S. Corp. v. United States*,
421 F.3d 1350 (Fed. Cir. 2005)................................................................22

*U.S. Steel Grp. v. United States*,
96 F.3d 1352 (Fed. Cir. 1996)..............................................................13, 14

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)..............................................................................12, 13

*Usinor v. United States*,
28 CIT 1107, 342 F. Supp. 2d 1267 (2004) ...........................................13

*Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United
States*, 217 F. Supp. 3d 1363 (Ct. Int'l Trade 2017)......................................12, 13

iv

# TABLE OF AUTHORITIES CONT'D

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................12

19 U.S.C. § 1671d(b)...........................................................................................38

19 U.S.C. § 1671d(b)(1).......................................................................................4

19 U.S.C. § 1673d(b)(1) ......................................................................................4

19 U.S.C. § 1677(7)(B)(i)(II)..............................................................................32

19 U.S.C. § 1677(7)(C)(ii)(II).................................................................29, 31, 32

19 U.S.C. § 1677(7)(C)(iii).................................................................................34

19 U.S.C. § 1677(7)(F)(i) ...................................................................................41

19 U.S.C. § 1677(7)(H)........................................................................................39

19 U.S.C. § 1677(h).............................................................................................11

19 U.S.C. § 1677e................................................................................................25

19 U.S.C. § 1677e(a) & (c).............................................................................26, 43

19 U.S.C. § 1677f (i)(3)(B)..................................................................................22

28 U.S.C. § 2639(a)(1).........................................................................................12

**Code of Federal Regulations**

19 C.F.R. § 207.20(b) .....................................................................................16, 19

**Federal Register Notice**

81 Fed. Reg. 91,198 (Dec. 16, 2016) .....................................................................1

**USITC Publications**

*IMTDCs from Canada and China*, Investigation Nos. 701-TA-550 and 731-TA-
1304-1305 (Preliminary), USITC Pub. 4587 (Dec. 2015).....................................6

# TABLE OF AUTHORITIES CONT'D

*Certain Biaxial Integral Geogrid Products from China*,
  Inv. Nos. 701-TA-554 and 731-TA-1309 (Final), USITC Pub. 4670
  (March 2017) ......................................................................................................21, 22

*Certain Kitchen Appliance and Shelving Racks*,
  Inv. Nos. 701-TA-458 and 731-TA-1154 (Final), USITC Pub. 4098
  (Aug. 2009) ..............................................................................................................21

*Diamond Sawblades and Parts Thereof from China*,
  Inv. No. 731-TA-1092 (Review) USITC Pub. 4559 (Sept. 2015)............................7

*IMTDCs from Canda and China*,
  Investigation Nos. 701-TA-550 and 731-TA-1304-1305 (Final), USITC Pub.
  4652 (Dec. 2016) ...............................................................................................1, 6

*Polyvinyl Alcohol from Taiwan*,
  Inv. No. 731-TA-1088 (Final), USITC Pub. 4218 (March 2011)............................22

Defendant U.S. International Trade Commission ("Commission") hereby responds to the brief filed by plaintiff T.B. Woods Incorporated ("Plaintiff" or "TBW"), which challenges certain aspects of the Commission's negative determinations regarding imports of certain large-diameter iron mechanical transfer drive components ("IMTDCs") from Canada and China. Because the Commission's determinations are supported by substantial record evidence and otherwise in accordance with law, we respectfully ask this Court to affirm them.

## I.      STATEMENT PURSUANT TO RULE 56.2

### A.      Administrative Determination Sought to be Reviewed

Plaintiff seeks review of the Commission's unanimous negative determinations in the investigations of IMTDCs from Canada and China. *IMTDCs from Canada and China*, Investigation Nos. 701-TA-550 and 731-TA-1304-1305 (Final), USITC Pub. 4652 (Dec. 2016) ("Final Views") (2-534).[1]  The determinations were published at 81 Fed. Reg. 91,198 (Dec. 16, 2016) (1-193).

### B.      Questions Presented and Summary of Argument

#### 1.      Did Plaintiff Waive a Challenge to the Commission's Analysis of Apparent U.S. Consumption and Market Shares?

Yes.  Plaintiff's brief largely focuses on issues concerning the Commission's calculations of apparent U.S. consumption and market shares.  Specifically, Plaintiff takes issue with the Commission's inclusion of U.S. shipments of small-diameter IMTDCs in these calculations.[2]

---

[1] Citations to record documents cite the list number, 1 for public and 2 for confidential, followed by the document number.  All citations to the Commission's Final Views and the Confidential Staff Report ("CR") are to the confidential version, record document 2-534.

[2] "Small-diameter IMTDCs" refer to IMTDCs with maximum nominal outside diameters under 4 inches, and "large-diameter IMTDCs" are those IMTDCs with nominal outside diameters 4 inches or larger.   Small-diameter IMTDCs were outside the final scope of imports subject to investigation.  They were, however, included in the Commission's definition of domestic like

Although Plaintiff argued for the Commission to define a narrower domestic like product encompassing only large-diameter IMTDCs, it stated that the Commission's determination to include small-diameter IMTDCs in the like product would not change the picture of the domestic industry.  On appeal, Plaintiff has abandoned its like product argument altogether, and instead, for the first time, raises a wholly new challenge, this one to the Commission's calculation methodology.  Having failed to timely challenge the methodology used to calculate apparent U.S. consumption and market shares, Plaintiff is barred from now raising it in this appeal.

Indeed, Plaintiff failed to avail itself of the multiple opportunities to question the Commission's intention, reflected in its preliminary determination and in its draft final phase questionnaires, to collect data on U.S. shipments of small-diameter IMTDCs.  Despite notice of this intention as well as distinct opportunities to comment on both the Commission's Prehearing and Final Staff Reports--in which the Commission, consistent with its normal practice, used the precise calculation methodology that Plaintiff now challenges—TBW did not raise the issue or make objections.

**2.     Is the Commission's analysis of apparent U.S. consumption and market shares reasonable and in accordance with law?**

Yes.  The Commission reasonably calculated apparent U.S. consumption and market shares based on U.S. shipment data for  (i) domestically produced merchandise that corresponded to its definition of domestic like product;  (ii) out-of-scope imports that corresponded to the domestic like product, including imports of small-diameter IMTDCs from subject countries (Canada and China) and imports of large- and small-diameter IMTDCs from nonsubject countries, and (iii) subject imports that corresponded to the scope of investigations.

---

product due to the lack of clear dividing lines between IMTDCs of various sizes – a finding that Plaintiff does not challenge.  *See* TBW Brief at 15.

CR at IV-18-20.  Following its usual practice, the Commission added together the U.S. shipments of these categories, and then calculated respective U.S. market shares by calculating the percentage of apparent U.S. consumption that U.S. shipments for each of these categories constituted for each individual year of the period of investigation ("POI").  CR at IV-18-20.

Plaintiff does not contest the Commission's statutorily-permissible finding that domestically-produced small- and large-diameter IMTDCs share many attributes with in-scope merchandise and should be included in a single continuous domestic like product.   Having so defined the like product, it was eminently reasonable and consistent with agency practice for the Commission to calculate apparent U.S. consumption and market shares based on U.S. shipments of IMTDCs of all sizes.

**3.      Are the Commission's findings that subject imports had neither significant price effects nor significant impact on the domestic industry supported by substantial record evidence and otherwise in accordance with law?**

Yes.  Plaintiff's challenges to the Commission's findings on price effects and impact are largely predicated on this Court disregarding the Commission's findings on apparent U.S. consumption and market shares.  These arguments fail for the same reasons as do Plaintiff's arguments concerning the consumption and market share calculations.   Although Plaintiff further claims that the agency failed to address contrary evidence on the record, the evidence cited by Plaintiff does not detract from the Commission's findings and does not support Plaintiff's arguments that the Commission's conclusions were in error.  Moreover, the Commission fully addressed in its Views the issues raised by Plaintiff, and explained its consideration of the evidence in the record as a whole.  In the end, Plaintiff merely asks this Court to reweigh record evidence to arrive at findings that Plaintiff would prefer.

The Court should also reject Plaintiff's efforts to ignore the statutory requirement that material injury be "by reason of" subject imports. 19 U.S.C. §§ 1671d(b)(1); 1673d(b)(1). Plaintiff instead proposes that the presence of significant volumes of low-priced subject imports that are a good substitute for the domestic product is alone sufficient to establish injury (Plaintiff's "economic logic").  Such a proposal overlooks the statute's requirement that there be a causal nexus between the domestic industry's condition and subject imports.  Applying the correct standard to the record facts, the Commission reasonably found that subject imports had neither significant price effects on the domestic like product nor a significant impact on the domestic industry.

**4.      Are the Commission's respective threat analyses of subject imports from Canada and China supported by substantial record evidence and otherwise in accordance with law?**

Yes.  As an initial matter, the Commission properly declined to cumulate subject imports from Canada and China for purposes of its threat analysis.   Contrary to Plaintiff's assertions, the Commission reasonably found that the record did not support cumulation of those imports, and discernibly explained the basis for this conclusion.  As the Commission explained, the closure of the largest exporter of subject merchandise from Canada would result in subject imports from Canada and China competing under different conditions in future.  Furthermore, the record evidence contradicted Plaintiff's contention of a "massive" industry of unfinished IMTDC producers in Canada.

Plaintiff's challenge to the Commission's standalone threat finding regarding subject imports from Canada lacks substance or merit.  While claiming that the Commission's determination was "inadequately explained," Plaintiff fails to identify any alleged deficiency in the Commission's explanation.  The Commission's threat determination on subject imports from Canada is supported by substantial evidence and otherwise in accordance with law.

Regarding the Commission's standalone threat finding on subject imports from China, Plaintiff predicates its arguments on this Court disregarding the Commission's findings on market shares, price effects, and impact from the agency's present material injury analysis.  Such findings, however, were reasonable, supported by substantial record evidence, and otherwise in accordance with law.  Plaintiff bases its remaining arguments on record evidence that, in Plaintiff's view, detracts from the agency's conclusions.  While claiming not to do so, Plaintiff asks this Court to reweigh the evidence.  The Commission considered all of the record evidence in reaching its negative threat determination on subject imports from China, and this determination is supported by substantial record evidence and is otherwise in accordance with law.

CONFIDENTIAL BUSINESS
INFORMATION DELETED

## II.    STATEMENT OF FACTS

On November 18, 2016, the Commission determined that an industry in the United States

was not materially injured or threatened with material injury by reason of imports from Canada

and China of large-diameter IMTDCs ("large-diameter IMTDCs") that were within the scope of

investigations defined by the U.S. Department of Commerce ("Commerce").  Final Views at 3.

In reaching negative determinations, the Commission defined a single domestic like product that

included IMTDCs of all diameters (*Id.* at 7-19), a finding that Plaintiff does not challenge on

appeal.[3]  TBW Brief at 15.  The Commission defined the domestic industry to include all U.S.

producers of the domestic like product (*id.* at 19-29), found that subject imports were not

negligible (*id*. at 29-32), and determined to cumulate imports from both subject countries for

purposes of present material injury.  *Id.* at 33-35.

### A.    The Evolution of the Scope of Investigations and Corresponding Impact on the Commission's Data Collection

As described in the Commission's Final Views at 8-12, TBW submitted eight separate

requests to Commerce during the underlying proceedings to revise the scope of investigations,

which sought to exclude numerous products that were initially included in Plaintiff's proposed

scope, including small-diameter IMTDCs.  The timing of TBW's proposed scope revisions

---

[3] The Commission likewise included small-diameter IMTDCs in its definition of the domestic like product in its preliminary determinations.  *IMTDCs from Canada and China*, Investigation Nos. 701-TA-550 and 731-TA-1304-1305 (Preliminary), USITC Pub. 4587 (Dec. 2015) ("Preliminary Views") (2-134), at 19-23.  In both its Preliminary and Final Views, the Commission found an overlap in production facilities, processes, and employees manufacturing small- and large-diameter IMTDCs, including [                                        ]. The record also showed similarities in the physical characteristics and end uses for small- and large-diameter IMTDCs, and an overlap in the channels of distribution in which they were sold.  Although small-diameter IMTDCs were not interchangeable for large-diameter IMTDCs, that was the case for any IMTDCs with different diameters.  Manufacturers' web sites and brochures, industry publications, and market participants did not identify any clear dividing line at 4-inches or elsewhere to differentiate small- and large-diameter IMTDCs.  Preliminary Views at 22-23; Final Views at 16-19.

NON-CONFIDENTIAL BUSINESS
INFORMATION DELETED

affected the collection, presentation, and consideration of data in the Commission's

investigations.  Apart from the inclusion of small-diameter IMTDCs, the Commission's domestic

like product mirrored the scope of investigations, such that each scope revision necessitated that

the Commission ask questionnaire respondents to revise and resubmit questionnaire data to

reflect the evolving scope.  Final Views at 11.  Nonetheless, the Commission determined that it

was able to rely on available data from importer questionnaire responses[4] ( *Id.* at 31) and on

domestic industry data accounting for approximately 90 percent of finished IMTDC production

in 2015 and approximately two-thirds of U.S. production of unfinished IMTDCs.  CR at III-1.

### B.   Present Material Injury Analysis

The Commission explained that it relied primarily on value-based indicators as the best

measure for the products in these investigations, consistent with its approach in other

investigations involving a large grouping of items that differ greatly in size, characteristics,

applications, and price.  Final Views at 51.[5]  Turning to volume considerations, the

Commission found that apparent U.S. consumption of IMTDCs, by value, fluctuated over the

POI but declined overall, initially increasing from $[          ] in 2013 to $[          ] in

2014 before declining to $[          ] in 2015, a lower level than the beginning of the period.

---

[4] The Commission received importer questionnaire responses from 145 firms, which are
estimated to account for 55.7 percent, by value, of imports from subject countries in 2015 in
relevant HTS reporting numbers.  These HTS reporting numbers include subject and nonsubject
merchandise, such that an estimate of coverage for subject merchandise alone was not possible.
CR at IV-1-3.

[5] *Citing, e.g.*, *Diamond Sawblades and Parts Thereof from China*, Inv. No. 731-TA-1092
(Review) USITC Pub. 4559 at 12 n. 64 (Sept. 2015).  Plaintiff does not contest the
Commission's determination to rely primarily on value-based data for these indicators, and the
petitions prepared by TBW also initially calculated apparent consumption and market share by
value.  Petitions, Vol. I at Exh. I-15 (2-1).  As discussed *infra,* Plaintiff's brief in places does not
specify when cited information refers to value- or quantity-based data, and sometimes relies on
quantity-based data when discussing the U.S. shipment and market share findings.  *See, e.g.*
TBW Br. at 12, 32.

CONFIDENTIAL BUSINESS
INFORMATION DELETED

Final Views at 43-44.  Apparent U.S. consumption was also lower in interim 2016 ($[

       ]) than in interim 2015 ($[                ]).[6]  *Id.*

    In this declining market, the Commission found that the domestic industry accounted for

the largest market share, by value (between [      ] and [      ] percent) or quantity (almost [

    ]), throughout the POI.  *Id.* at 47.  Cumulated subject imports from Canada and China

accounted for the next largest share of the U.S. market, approximately [          ] by value or

pieces.  *Id.* at 47.  While no single source of nonsubject imports exceeded the market share of

cumulated subject imports, the combined total of IMTDC imports from countries not subject to

investigation and of out-of-scope IMTDCs from Canada and China corresponding to the

domestic like product accounted for approximately [          ] of the U.S. market by value and

[          ] by quantity.  *Id.* at 48 & CR at Table IV-7.  The Commission further found a high

degree of substitutability between IMTDCs manufactured in the United States and those

imported from Canada and China.  *Id.* at 50.

    The Commission found that cumulated subject import volumes were significant

absolutely and relative to apparent consumption, but also that U.S. shipments of cumulated

subject imports and the domestic like product followed similar trends that mirrored changes in

apparent U.S. consumption over the POI.  *Id.* at 52-53.  These fluctuations did not result in

significant changes in market share.  The domestic industry's market share increased by value

(increasing [     ] percentage points between 2013 and 2015 and was higher in interim 2016 than

interim 2015), and was generally steady by quantity (decreasing [     ] percentage points between

2013 and 2015 and was [     ] percentage points lower in interim 2016 than in interim 2015).

---

[6] By quantity, apparent U.S. consumption followed similar trends: increasing from 2013
([          ] pieces) to 2014 ([          ] pieces) before decreasing in 2015 ([          ] pieces),
which was a slightly higher level than in 2013.  Apparent consumption was also lower in interim
2016 ([          ] pieces) than in interim 2015 ([          ] pieces.  Final Views at 44 n.148.

BUSINESS PROPRIETARY
INFORMATION DELETED

Subject imports' market share, by value and quantity, was generally steady between 2013 and 2015 (increasing [     ] percent by value and quantity) and was lower in interim 2016 than interim 2015.  *Id*. at 53-54 & n.199.

The Commission recognized that the pricing data showed pervasive underselling by subject imports (*id*.  at 56-57), but the Commission nonetheless found that such underselling did not result in significant price effects.  In this regard, the Commission pointed to the lack of a market share shift from the domestic industry to subject imports as well as the absence of significant price depression or price suppression for the domestic like product.  *Id*. at 57-58.

Examining the pricing data for six IMTDC products that represented the largest volume products for TBW and other domestic producers (*id*. at 55 n.203), the Commission found that the pricing data did not show significant price depression, or any clear pricing trends, because U.S. prices increased for nearly as many products (five) as those that decreased (six).  *Id*. at 58.  The Commission also cited evidence showing that the domestic industry increased U.S. shipments and prices for some products notwithstanding significant volumes of lower priced subject imports being simultaneously present in the market.  *Id*.   The Commission found that these observed price increases, accompanied by a steady cost of goods sold ("COGS") to net sales ratio, and declines in apparent U.S. consumption indicated that cumulated subject imports also did not prevent price increases that might otherwise have occurred (*i.e.*, did not suppress prices for the domestic product).  *Id*. at 59.   The Commission found that pricing fluctuations in domestically produced products resulted not from the price effects of subject imports, whose prices remained comparatively stable, but rather reflected pricing variability reported by market participants, who reported that IMTDC prices could vary significantly for the same product depending on factors such as branding, customer, application, and lead time.  *Id*. at 58.

With respect to impact, the Commission found that many of the domestic industry's performance indicators followed changes in apparent U.S. consumption over the POI. That is, they increased from 2013 to 2014 before decreasing in 2015, and were lower in interim 2016 than in interim 2015. *Id*. at 61-62. While acknowledging the domestic industry's poor and declining financial performance over the POI, the Commission found that record evidence did not indicate that this performance resulted from subject imports. *Id*. at 63-66. For instance, the domestic industry's financial performance declined most sharply between 2014 and 2015, including declines in net sales, operating income, and net income. *Id*. at 64. These declines in financial performance occurred during a period when apparent U.S. consumption, U.S. shipments for the domestic industry, and U.S. shipments for subject imports all declined, which resulted in the domestic industry maintaining a steady (by quantity) or increasing (by value) market share as compared to subject imports. *Id*. The Commission thus concluded that the domestic industry's declines in financial performance did not result from subject imports taking sales or market share from the domestic industry. Rather, as the Commission explained, the financial declines resulted from unfavorable changes in the domestic industry's cost structure, specifically increased labor and selling, general and administrative ("SG&A") costs, during a period of declining apparent U.S. consumption and shipments. *Id*. at 65. Because of the lack of correlation between subject imports and the domestic industry's performance, the Commission concluded that cumulated subject imports did not have a significant impact on the domestic industry. *Id*. at 66.

### C.     Threat of Material Injury Analysis

The Commission also found no threat of material injury from imports of certain IMTDCs from Canada or China. Final Views at 88. As an initial matter, the Commission exercised its discretion not to cumulate subject imports from Canada and China for purposes of its threat

CONFIDENTIAL BUSINESS
INFORMATION DELETED

analysis. [7]  *Id*.  The Commission explained that subject imports from Canada and China were not

likely to compete under similar conditions of competition in the U.S. market in the imminent

future because the largest and primary source of subject imports from Canada closed in 2016,[8]

while no such disruption had occurred in the Chinese industry.  *Id*. at 68.

      With respect to subject imports from Canada, the Commission found that there was no

indication that there were likely to be significant volumes of subject imports from Canada in the

imminent future.  The Commission noted that U.S. shipments and market share of subject

imports from Canada were lower in 2015 than in 2013 and that with Baldor's closure of its

Canadian production facilities in 2016, its projected future production and capacity in Canada

would be [      ].  *Id*. at 76-77.  The Commission also found that any future subject imports from

Canada were unlikely to cause significant price effects in the imminent future, noting that even

the significant volumes of underselling subject imports from Canada observed during the POI

failed to have either price depressing or price suppressing effects on the domestic like product.

*Id*. at 77-78.  Because the Commission found that future subject imports were unlikely to be of

significant volumes or have significant price effects in the imminent future, the Commission

concluded that such imports were unlikely to have a significant impact on the domestic industry

in the imminent future. *Id*. at 78-79.

      With respect to subject imports from China, the Commission noted that the Chinese

IMTDC industry reported large production and capacity, but exports to the United States

nonetheless accounted for a declining share of total shipments by the Chinese industry (less than

one-third) over the POI.  *Id*. at 79-80.  U.S. shipments of subject imports from China were also

---

[7] The Commission's decision to cumulate subject imports in a threat analysis is discretionary
under 19 U.S.C. § 1677(h).
[8] Baldor Electric Company Canada, a Canadian manufacturer and exporter of subject
merchandise ("Baldor"), closed its Canadian production facility on May 27, 2016 and moved all
finishing equipment to its manufacturing facilities in the United States.  Final Views at 3, n.2.

lower in 2015 than in 2013.  *Id*. at 80.  Noting that U.S. importers of subject merchandise from China did not report arranging for sizable volumes of such imports in the imminent future,(*id*. at 81), the Commission found that there was not likely to be a significant increase in such imports in the imminent future.  *Id*. at 85.  Given the likely volumes, and their lack of significant price effects over the POI notwithstanding pervasive underselling, the Commission concluded that subject imports from China were unlikely to have significant price effects in the imminent future. *Id*. at 86.  Finally, the Commission found that subject imports from China were unlikely to have a significant impact on the domestic industry in the imminent future, noting the lack of correlation between the domestic industry's performance indicators and subject imports from China over the POI.  *Id*. at 87.

## III.   STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court must review the Commission's final antidumping and countervailing duty determinations by assessing whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States*, 217 F.Supp.3d 1363

(Ct. Int'l Trade 2017); *Imperial Sugar Co. v. United States*, 181 F. Supp. 3d 1284, 1294 (Ct. Int'l Trade 2016).

Under the substantial evidence standard, the Courts defer to the Commission's reasoned fact-finding and analysis in injury investigations. *See, e.g., Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354-55 (Fed. Cir. 2006); *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996). In applying that standard, a Court may not, "even as to matters not requiring expertise . . . displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp.*, 340 U.S. at 488; *Grupo Indus. Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996); *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1168 (Ct. Int'l Trade 2017). Even if one or more subsidiary findings of the Commission are unsupported by substantial evidence, the Court must still assess whether the remaining evidence cited by the Commission provides substantial evidence for the Commission's determinations. *U.S. Steel Grp.*, 96 F.3d at 1367. In other words, the Court may not "reweigh the evidence or substitute its own judgment for that of the agency." *Coal. of Gulf Shrimp Indus. v. United States,* 71 F. Supp. 3d 1356, 1361 (Ct. Int'l Trade 2015); *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004); *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1315 (Ct. Int'l Trade 2015). Moreover, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp.*, 96 F.3d at 1357; *Nippon Steel*, 458 F.3d at 1350. In its role as trier of fact in injury investigations, "the Commission 'has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis.'" *Nevinnomysskiy Azot*

*v. United States*, 32 CIT 642, 653, 565 F. Supp. 2d 1357, 1367-68 (2008) (quoting *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000)).  As the principal fact-finder, the "ITC is afforded considerable discretion in evaluating information obtained from questionnaires." *NSK Corp. v. United States*, 32 CIT 966, 978, 577 F. Supp. 2d 1322, 1336-37 (2008). As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.  "Congress has allocated to the Commission the task of making these complex determinations," the Federal Circuit has explained, and "{o}urs is only to review those decisions for reasonableness." *U.S. Steel Grp.*, 96 F.3d at 1357.

When examining a challenge to the Commission's methodology, this Court examines "not what methodology [Plaintiffs] would prefer," but "whether the methodology actually used by the Commission was reasonable." *Shandong TTCA Biochemistry Co. v. United States*, 774 F. Supp. 2d 1317, 1329 (Ct. Int'l Trade 2011) (quotation marks omitted).  "As long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose…the Court will not… question the agency's methodology." *Siemens Energy, Inc. v. United States*, 992 F.Supp. 2d 1315, 1325 (Ct. Int'l Trade 2014) (quoting *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F.Supp. 961, 966 (1986), *aff'd* 810 F. 2d 1137 (Fed. Cir. 1987)), *aff'd* 806 F.3d 1367 (Fed. Cir. 2015).

## IV.   ARGUMENT

### A.   The Commission's Calculation of Apparent U.S. Consumption and Market Share Is Reasonable and in Accordance With Law

The Commission reasonably calculated apparent U.S. consumption and market shares

based on collected data for U.S. shipments of (i) domestically produced merchandise that corresponded to its definition of domestic like product;  (ii) nonsubject imports that corresponded to the domestic like product, including imports of small-diameter IMTDCs from subject countries (Canada and China) and imports of large- and small-diameter IMTDCs from nonsubject countries, and (iii) subject imports that corresponded to the scope of investigations. CR at IV-18-20.   This method of calculating apparent U.S. consumption and market shares follows the Commission's consistent practice for its investigations, which Plaintiff acknowledges in its brief.  TBW Br. at 13; *See e.g., Nucor Fastener Div. v. United States*, 791 F.Supp.2d 1269, 1283 n.22 (Ct. Int'l Trade 2011) (defining apparent U.S. consumption in Commission proceedings).   Nonetheless, Plaintiff argues that the Commission was required to explain how its calculation of market share was reliable because the product ranges among domestic merchandise, nonsubject imports, and subject imports were not the same.  TBW Br. at 15.  For the reasons stated below, the Court should reject Plaintiff's arguments and uphold the Commission's calculation of apparent U.S. consumption and market shares as reasonable and in accordance with law.

### 1.  Plaintiff Failed to Exhaust Its Administrative Remedies

Plaintiff failed to raise this argument before the Commission and is therefore barred from raising it for the first time on appeal.  It is well settled that "'no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted,' … since it is 'a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.'"  *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (citations omitted).

The parties, including Plaintiff, knew from the start of the final phase of the

Commission's investigation that the Commission intended to collect U.S. shipment data for small-diameter IMTDCs that corresponded to its definition of domestic like product from domestic producers, importers, and purchasers.  Yet, at no point did Plaintiff suggest that the Commission should collect different data.  Nor did Plaintiff argue that the Commission should alter its standard methodology for calculating apparent U.S. consumption and market shares. Indeed, Plaintiff had numerous opportunities over the course of the investigations to question the Commission's questionnaire requests or the Commission's calculations methodology, but failed to raise such objections.  As summarized below:

- In its preliminary determination issued on December 14, 2015, the Commission defined its domestic like product to include small-diameter IMTDCs and noted its intention to collect U.S. shipment data on such products from domestic producers, importers, and purchasers in the final phase of the investigations.  Preliminary Views at 59.

- On June 17, 2016, the Commission issued draft final phase questionnaires to parties for comment, which in draft form requested shipment data on small-diameter IMTDCs from U.S. producers, U.S. importers, and U.S. purchasers.  Draft Questionnaires (1-81) (U.S. Producer Questionnaire at II-10 and II-12; Importer Questionnaire at II-7, II-8, II-11, II-12, II-15, II-16, II-21and II-22; Purchaser Questionnaire at II-1).

- The Commission requires that parties wishing the Commission to collect alternative data specifically make such requests in their comments on draft questionnaires.  Preliminary Views at 28; 19 C.F.R. § 207.20(b).  Plaintiff submitted comments concerning the draft questionnaires on June 24, 2016, but these comments did not address the Commission's collection of U.S. shipments for small-diameter IMTDCs or any other matters related to the collection of data for apparent U.S. consumption and market shares.  TBW Comments

on Draft Questionnaires at 2-9 (2-135).

- In the Commission's final phase questionnaires issued to parties, the instructions for U.S. producers, U.S. importers, and U.S. purchasers noted that the Commission had preliminarily defined the domestic like product to include small-diameter IMTDCs and specified in certain tables that U.S. shipments should include small-diameter IMTDCs. Blank Questionnaires (1-94) (U.S. Producers' Questionnaire at pg. 2, II-10, and II-12; U.S. Importers' Questionnaire at pg. 2, II-6, II-8, II-10, II-12, and II-14; U.S. Purchasers' Questionnaire at pg. 2 and II-1).

- On October 4, 2016, the Commission issued its Prehearing Staff Report, which calculated apparent U.S. consumption and market shares using the same methodology that it ultimately relied on its Final Views. Prehearing Staff Report at IV-17-20 (2-470).

- On October 11, 2016, Plaintiff submitted its Prehearing Brief outlining its arguments regarding data in the Prehearing Staff Report. Plaintiff did not address the Commission's calculation of apparent U.S. consumption and market shares. TBW Prehearing Br. at 22-24 (2-474) (arguing only that subject import volumes were significant). While Plaintiff asked the Commission to reconsider its preliminary domestic like product definition and to define the product more narrowly, TBW Prehearing Br. at 2-3, TBW did not argue that, if the Commission adhered to its preliminary definition, it should adjust the apparent consumption and market share calculations.

- On October 18, 2016, the Commission held its hearing for the underlying investigations. Plaintiff participated in the hearing and was specifically asked about the apparent lack of market share shift to subject imports in the Commission's data, yet Plaintiff raised no objection to the Commission's calculation of market shares in response to this inquiry.

Hearing Transcript at 78-82 ("Hearing Tr.") (1-185). To the contrary, counsel for Plaintiff stated that the inclusion of small-diameter IMTDCs in the Commission's domestic like product had not impacted the Commission's data on the IMTDC industry, indicating that the Commission had "a very similar picture of the industry" whether small-diameter IMTDCs were included in the Commission's definition of domestic like product or not. *Id.* at 72 (Pickard).

- On October 25, 2016, Plaintiff submitted its Posthearing Brief addressing issues from the hearing and again did not address the Commission's calculation of apparent U.S. or market shares. TBW Posthearing Brief at i and 4-7 (2-490) (arguing only the subject import volumes were significant).

- On November 8, 2016, the Commission issued its Final Staff Report, which again calculated apparent U.S. consumption and market shares by including U.S. shipments of small-diameter IMTDCs for domestic merchandise and nonsubject imports. CR at IV-18-21 (2-521).

- On November 15, 2016, Plaintiff submitted its final comments in these investigations. Far from challenging the Commission's calculation of apparent U.S. consumption and market shares, TBW accepted the final report's calculation of apparent U.S. consumption. TBW Revised Final Comments at 4-5 (2-532).

Thus, as illustrated, TBW had multiple opportunities to question the Commission's collection of U.S. shipment data for small-diameter IMTDCs, yet Plaintiff did not object to the manner in which staff relied on the questionnaire data to calculate apparent U.S. consumption and market shares in its Prehearing or Posthearing Staff Reports.

In the first instance, TBW could have, but did not, timely object to the nature of the

shipment data sought in the questionnaires.  Commission Rule 207.20(b) provides that {a}ny party desiring to comment on draft questionnaires shall submit such comments in writing to the Commission within {the time specified when the drafts are circulated}. The rule also provides that "{a}ll requests for collecting new information shall be presented at this time," and that the Commission "will disregard subsequent requests for collection of new information absent a showing that there is a compelling need for the information and that the information could not have been requested in the comments on the draft questionnaires."  19 C.F.R. § 207.20(b). Behind this rule is the notion that interested parties should be given the opportunity to raise, in a timely manner, concerns about the information sought for purposes of the Commission's analysis so as to provide the Commission a meaningful opportunity to consider data collection issues before issuing questionnaires.  Plaintiff did not comment on the range of the shipment data requested, or suggest alternative data that the Commission should collect for purposes of its shipment-reliant calculations.

Nor did Plaintiff argue in its submissions to the Commission, as it now does in this appeal, that the Commission should adjust the market share for imports to account for alleged underreporting.  TBW Br. at 15-16.  Indeed, both the Commission's Prehearing and Final Staff Reports used the methodology that Plaintiff challenges here.  Despite having four opportunities to comment on the use of this methodology in these investigations –in its Prehearing Brief, at the hearing, in its Posthearing Brief, and in its Final Comments – TBW simply did not question the methodology the Commission was using to calculate apparent U.S. consumption and market shares.  Rather, Plaintiff raised data issues only in relation to its argument, rejected by the Commission, that that there was a "gap" in importer coverage—an allegation that was not supported by the record evidence, as explained *infra* in Section IV.A.3.  Moreover, during the

administrative proceedings, Plaintiff focused on the volumes of subject imports, without ever

questioning the calculations for apparent U.S. consumption and market share.[9]

     As demonstrated, Plaintiff failed to raise these arguments before the Commission, and

indeed relied on the very data it now says are deficient to make its arguments before the agency.

Accordingly, Plaintiff is barred from raising this issue for the first time before this Court.

> **2.  The Commission's Calculation of Apparent U.S. Consumption and Market Shares Is Reasonable, Supported by Substantial Evidence, and In Accordance With Law**

     Even if this Court were to consider Plaintiff's arguments relating to apparent U.S.

consumption and market shares, Plaintiff's contentions fail on the substance.  As a starting point,

the Commission's domestic like product determination forms the basis for its data collection,

including the collection of U.S. shipments of merchandise used to calculate apparent U.S.

consumption and market shares.  *See e.g., Nucor*, 791 F.Supp.2d at 1283 n.22.  Plaintiff,

however, does not challenge the Commission's definition of the domestic like product.  *See*

TBW Br. at 15.  Thus, Plaintiff does not challenge the Commission's finding that there was no

clear dividing line between small- and large-diameter IMTDCs because all of these IMTDCs

share similar production facilities, production processes, physical characteristics, end uses, and

channels of distribution.  Preliminary Views at 22-23; Final Views at 16-19.  Having accepted

before this Court the Commission's definition of domestic like product, and having obtained a

---

[9] Although Plaintiff's own witness stated at the Commission's hearing that he "assumed" some product was not reported in agency market shares based on "anecdotal data and internal data," Hearing Tr. at 80-81 (Christenson), Plaintiff never pursued this matter.  Plaintiff did not, for example, provide either this "internal data" or argue in either of its two additional written submissions that the alleged absence of such data resulted in the Commission's calculation of market share being inaccurate.  *See* TBW Posthearing Br. at i and 4-7; TBW Final Comments at 4-7.

scope of investigation from Commerce that it itself preferred, Plaintiff's complaint about

products included in the Commission's comparative analyses is a *non sequitur*.

This Court has found that the Commission has "broad discretion to choose a

methodology" for measuring U.S. shipments, and such methodology need only be "a reasonable

means of effectuating the statutory purpose." *International Imaging Materials, Inc. v. U.S. Int'l*

*Trade Commission*, 30 C.I.T. 1181, 1189 (2006) (citations omitted) (upholding Commission

determination to exclude certain U.S. shipments from subject import data that underwent further

manufacturing in the United States).  In this investigation, the Commission followed its usual

and reasonable methodology for calculating apparent U.S. consumption and market shares by

gathering data on U.S. shipments of (i) domestically produced merchandise that corresponded to

its definition of domestic like product;  (ii) out-of-scope imports that corresponded to the

domestic like product, including imports of small-diameter IMTDCs from subject countries

(Canada and China) and imports of large- and small-diameter IMTDCs from nonsubject

countries, and (iii) subject imports that corresponded to the scope of investigation. [10]  CR at IV-

18-20.  This methodology reflects the agency's consistent practice whether the domestic like

product is same as the scope of investigation, or whether the Commission broadens its definition

to include products outside the scope of investigation.   *See e.g.*, *Certain Biaxial Integral*

*Geogrid Products from China*, Inv. Nos. 701-TA-554 and 731-TA-1309 (Final), USITC Pub.

---

[10] Notably, Plaintiff did not argue that the Commission should find that large- and small-diameter
IMTDCs were two separate like products.  To the contrary, Plaintiff argued that there should be a
single domestic like product.  TBW Prehearing Br. at 2-3.  If Plaintiff truly wanted the
Commission to make separate consumption and market share allocations by distinguishing
between large- and small-diameter IMTDCs, it could have, but did not, advocate for two separate
like products, in which case, domestic data for large diameter IMTDCs would have been
compared directly to imports of large diameter IMTDCs, and domestic data for small diameter
IMTDCs would have been compared directly to imports of small diameter IMTDCs.  *See e.g.*,
*Certain Kitchen Appliance and Shelving Racks*, Inv. Nos. 701-TA-458 and 731-TA-1154 (Final),
USITC Pub. 4098 (Aug. 2009) at 5-7 (finding that shelving racks for refrigeration were a
different domestic like product from shelving racks for ovens).

4670 (March 2017) at I-3 (expanding domestic like product and gathering U.S. shipments corresponding to the domestic like product); *see also Polyvinyl Alcohol from Taiwan*, Inv. No. 731-TA-1088 (Final), USITC Pub. 4218 (March 2011) at I-1 (same).  Indeed, this Court has affirmed Commission investigations in which the Commission expanded its definition of domestic like product and gathered data on U.S. shipments of such products.  *See e.g., LG Electronics v. United States Int'l Trade Commission*, 26 F.Supp.3d 1338 (Ct. Int'l Trade 2014) (affirming Commission investigation of Large Residential Washers from Korea and Mexico).

Finally, Plaintiff argues that the Commission's calculation of apparent U.S. consumption and market shares required further explanation.  TBW Br. at 15.  As outlined above, however, the Commission was explicit in explaining its methodology to calculate apparent U.S. consumption and market shares throughout the investigations: first indicating its intent to include U.S. shipments of small-diameter IMTDCs in its in its preliminary views, explicitly requesting such U.S. shipments in its final phase questionnaires, and clearly explaining such calculations in its Final Views and accompanying Staff Report..  Preliminary Views at 59; Blank Questionnaires (1-94), U.S. Producers' Questionnaire at pg. 2, II-10, and II-12; U.S. Importers' Questionnaire at pg. 2, II-6, II-8, II-10, II-12, and II-14; U.S. Purchasers' Questionnaire at pg. 2 and II-1; Final Views at 44-48; CR at IV-18-20.  While the Commission must address "relevant arguments" made by interested parties, reviewing Courts have underscored that the Commission is not obligated to address even every argument *actually raised* by parties when such arguments are not relevant to the agency's determination.  19 U.S.C. § 1677f (i)(3)(B); *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1356 (Fed. Cir. 2005).  Here, TBW did not suggest before that agency that it should deviate from its consistent practice and methodology, and the Commission was thus under no statutory obligation to offer further explanation.

**3.   The Commission Considered All of the Relevant Record Evidence and Reasonably Found that Subject Imports Did Not Take Market Share from the Domestic Industry**

The Commission reasonably found that fluctuations in U.S. shipments for the domestic industry and importers of subject merchandise generally followed trends in apparent U.S. consumption over the POI, with the result that subject imports did not take significant market share from the domestic industry.  Final Views at 52-54.  Again leaning on its misplaced and belated challenge to the Commission's methodology for calculating apparent U.S. consumption and market shares, Plaintiff argues that the Commission's methodology "masked" an increase in market share by subject imports.  TBW Br. at 14-16.  As noted above, the Commission's methodology for calculating apparent U.S. consumption and market shares was reasonable and in accordance with law.  The evidence cited by Plaintiff as supposedly "undermining" the Commission's findings does not support its argument of a "masked" increase in subject import market share.

Plaintiff argues that the Commission's alleged low data coverage for subject imports from China undermined the reliability of its data on U.S. shipments and that the issue "went largely unremarked" and required further explanation.  TBW Br. at 15-16.  The Commission discussed at length in both its opinion and accompanying report the agency's efforts to identify U.S. importers of subject merchandise, and the extent of data obtained from these parties.  Final Views at 30-32; CR at IV-1-4.  Indeed, it is unclear what further explanation Plaintiff believes was necessary.[11]

---

[11] To the degree Plaintiff believes that the Commission was required to address the impact of importer questionnaire coverage on market shares specifically, we note above that Plaintiff did not make this argument before the agency.

Nor did Plaintiff propose a viable alternative source of data.  No party argued in the underlying proceeding that the Commission should rely on official import statistics, which included large amounts of nonsubject merchandise.  While Plaintiff suggested in the underlying proceeding that the Commission rely on weight-based data to measure imports, such data would have been derived from the importer questionnaire responses that Plaintiff now attacks as incomplete.  Final Views at 51-52.

Plaintiff also misunderstands the Commission's coverage of subject imports.  The Commission received questionnaire responses from importers accounting for 50 percent of *total imports* from Canada and China under HTS provisions that included *both* subject merchandise and nonsubject merchandise.  CR at IV-3.  The Commission contacted importers under these provisions that were (i) identified in the petitions (83 percent of whom responded to Commission questionnaires) or (ii) leading companies accounting for 61 percent of value of imports under these provisions.[12]  *Id.*  Thus, the Commission's coverage of *subject imports* was likely higher than 50 percent for cumulated subject imports (or 40 percent for China alone), but a more precise estimate of such coverage was not possible because of the unknown quantity of nonsubject merchandise in these HTS provisions.  CR at I-8.

Plaintiff nonetheless argues that there was a "large gap" in importer coverage.  TBW Br. at 16.  The extent of any "gap," however, is speculation on Plaintiff's part and not supported by record evidence.  As recounted in the Commission's Views, any estimate of importer coverage for IMTDCs is complicated due to the large number of possible importers, a lack of customs data specific to IMTDCs, and the complex description of merchandise with numerous exclusions.  Final Views at 31-32.  While the Commission issued questionnaires to more than 300 possible

[12] The remaining 39 percent by value of imports under these provisions were imported by more than 3,000 smaller firms.  CR at IV-3.

BUSINESS
PROPRIETARY INFORMATION DELETED

importers of IMTDCs, nearly 80% of responding firms reported not importing subject

merchandise.  *Id.*  Indeed, as Plaintiff proposed additional scope exclusions during the course of

the investigation, some parties that had previously reported importing or exporting subject

merchandise indicated that all such products had been excluded from the revised scope of

investigations. *See e.g.*, U.S. Importer Response from [                              ] (confirming

that all previously reported imports had been excluded under scope revisions); Final Views at 84

(noting that in Commerce's investigation of IMTDCs from China a mandatory respondent

withdrew from the investigation because its exports had been excluded under scope revisions).

In light of the fluid nature of the scope of investigations and uncertain customs data, Plaintiff's

argument of a "large gap" is speculative.

Indeed, the only record evidence cited by Plaintiff to support this contention is a single

importer that did not submit a questionnaire response to the Commission.  TBW Br. at 16 n.11.

We note, however, that Plaintiff identified three such U.S. importers in its Prehearing Brief

before the agency, but that two of these importers submitted questionnaire responses to the

agency prior to publication of its Final Report.  Prehearing Br. at 25-26; Final Views at 31.  The

remaining firm cited by Plaintiff, [                              ], accounted for just [    ]% of a single

foreign producer's ([                                             ]) reported exports to

the United States in 2015.  TBW Br. at 16; Foreign Producer Questionnaire, at I-5 ([        ]).

The Commission, however, received responses from the remaining importers identified by this

producer and that accounted for [    ]% of its exports in 2015.  *Id.*

Finally, Plaintiff's suggestion that the Commission should have upwardly adjusted its

import data as "facts otherwise available" is unavailing. TBW Br. at 16.  When utilizing 19

U.S.C. § 1677e , inferences made by the Commission must nonetheless be based on record

25

CONFIDENTIAL BUSINESS
INFORMATION DELETED

evidence, whether facts otherwise available on the record or secondary information that has been

corroborated by record evidence. 19 U.S.C. § 1677e(a) & (c); *F.lli De Cecco Di Filippo Fara S.

Martino S.p.A. v. United States*, 216 F.3d 1027, 1034 (Fed. Cir. 2000) (finding that agency use of

facts available "should be reasonable and have some basis in reality."). As set out above,

however, record evidence did not confirm a "large gap" in import data. Any upward adjustment

in imports would thus be based on speculation, not record evidence, and be contrary to law. *Id*.

Plaintiff further notes the isolated fact that the import volume of subject merchandise

increased, by quantity and value, between 2013 and 2015, and suggests that this somehow

undermines the Commission's findings that subject imports did not take market share from the

domestic industry during the POI. TBW Br. at 14. While Plaintiff is correct that import

quantities increased [    ] during the POI, Plaintiff fails to recognize that the Commission

primarily relied on value-based data, which show that U.S. shipments of subject imports

decreased [    ] percent by value. CR at Table C-1. Also, a comparison of data on a quantity

basis shows that U.S. producers' production was steady, and even rose somewhat, between 2013

and 2015. CR at Table III-11.

Furthermore, for purposes of analyzing market share, U.S. shipments of subject imports

are examined not in isolation but compared to U.S. shipments of the domestic industry and of

nonsubject imports. As these data show, U.S. shipments of both subject imports and the

domestic like product followed similar trends to those of the subject imports over the POI, which

resulted in no significant change in market share for either. [13] CR at Table C-1.

---

[13] Subject market share was [    ] percent in 2013, [    ] percent in 2014,and [    ] percent in
2015; U.S. producer market share was [    ] percent  in 2013, [    ] percent in 2014, and
[    ] percent in 2015. Before the agency, TBW argued that because the Commission's importer
questionnaires encompassed only 50% of imports in relevant HTS categories, the Commission
should have doubled subject import volumes as facts otherwise available to account for such
missing data. TBW Prehearing Br. at 25-26; TBW Final Comments at 5-6. While such an

CONFIDENTIAL BUSINESS
INFORMATION DELETED

Moreover, subject import's increasing percentage of all imports by value resulted from a sharp decrease in nonsubject imports between 2014 and 2015, which decreased more than subject imports.[14]  CR at Table IV-2.  In contrast, when comparing all U.S. shipments, U.S. shipments for the domestic like product by value decreased even less than those for subject imports or nonsubject imports in this same time period, which resulted in the domestic industry increasing market share at the expense of nonsubject imports in 2015.[15]  *See* CR at Table C-1.  Thus, viewed in any light, the evidence and arguments upon which Plaintiff relies do not show a "masked" increase in subject import market share, at the expense of the domestic industry or otherwise.

---

adjustment would have increased the absolute volume and market share of subject imports, it would not have resulted in data showing that subject imports *took market share* from the domestic industry.  For instance, even using TBW's extreme suggestion of doubling the volume of subject import shipments would not have changed the comparative market share dynamics.  Measured by value, doubling such shipments would have resulted in subject imports having a market share of [     ] percent in 2013, [     ] percent in 2014, and [     ] percent in 2015, whereas the domestic industry's market share would have been [     ] percent in 2013, [     ] percent in 2014, and [     ] percent in 2015.  *Calculated from* CR at Table IV-6 (adding $42,171,000 in value to subject import shipments and apparent consumption for 2013, $44,129,000 for 2014, and $40,231,000 for 2015).  As this illustrates, no matter how Plaintiff would manipulate the subject import data, it would not change the accuracy of the Commission's key finding that subject import market share was essentially steady and underselling did not lead to shifts in market share.  Final Views at 64-66.

[14] By quantity, import volumes of nonsubject imports increased from 2014 to 2015, albeit somewhat less than subject imports.  As a result, the percentage of imports accounted for by subject imports by quantity increased only [     ] percentage points between 2013 and 2015.  CR at Table IV-2.

[15] By value, the domestic industry's market share increased [     ] percentage points between 2014 and 2015, while that of subject imports increased [     ] percentage points.  CR at Table IV-7.  By quantity, U.S. shipments for the domestic industry decreased more than U.S. shipments of subject imports, CR at Table C-1, which resulted in subject import market share increasing [     ] percentage points between 2014 and 2015 while the domestic industry's market share decreased [     ] percent.  CR at Table IV-7.

**B.      The Commission's Analysis of Present Material Injury Is Supported by Substantial Record Evidence and in Accordance With Law**

In finding no present material injury, the Commission found that significant volumes of cumulated subject imports entered into the United States that were good substitutes for the domestic like product, and that such cumulated subject imports pervasively undersold the domestic like product.  Final Views at 54-58.  The Commission nonetheless found that this underselling did not lead to significant shifts in market share, or to price depression or suppression of the domestic product.  *Id*. at 57-60.  The Commission further found a lack of correlation between the domestic industry's performance and subject imports.  *Id*. at 64-66.  As such, the Commission concluded that subject imports had neither significant price effects nor significant impact on the domestic industry.  *Id*. at 66.

Plaintiff argues that the Commission's findings on price effects and impact are unsupported by substantial evidence, and that the Commission's conclusions contradict "economic logic."  To the large extent Plaintiff's arguments are predicated on its challenge to the Commission's findings on apparent U.S. consumption and market share, we have already shown above that such findings were reasonable, supported by substantial evidence, and otherwise in accordance with law.  Plaintiff's remaining arguments merely ask this Court to reweigh record evidence already considered by the Commission.  Because the Commission's findings on price effects and impact were supported by substantial evidence and otherwise in accordance with law, this Court should reject Plaintiff's arguments and affirm the Commission's finding of no present material injury.

**1.    The Commission's Findings on Price Depression Are Supported by Substantial Record Evidence and in Accordance With Law**

In examining possible price depression of the domestic product,[16] the Commission acknowledged that pricing data indicated cumulated subject imports pervasively undersold the domestic product during the POI.  The Commission found, however, that underselling by subject imports did not result in subject imports taking U.S. market share from the domestic industry, and that the domestic industry even gained market share by value over the POI.  Final Views at 57.  The Commission further found that pricing data did not show any clear pricing trends for the domestic product.  *Id*. at 58.  Prices increased for nearly as many products (five) as those that decreased (six), prices for some domestic products experienced extreme fluctuations even as subject import prices remained steady, and price increases occurred for some domestic products notwithstanding large volumes of lower-priced subject imports being present in the market.  *Id*.

Plaintiff argues that the Commission "failed to acknowledge or discuss" record evidence that showed prices for individual pricing products were lower at the end of the POI than at the beginning.  TBW Br. at 20-21.  This contention is belied by the Commission's Views.  The Commission fully acknowledged that prices of the domestic product finished the POI lower for six pricing products, but noted that such decreases were balanced by price increases for nearly as many products, five.  Final Views at 58.  The Commission also reasonably found that the extreme fluctuations in prices for some domestic products, when compared to relatively steady subject import prices of the same product, further undermined any causal nexus between prices for the domestic product and subject imports.  *Id*. at 58.  Contrary to Plaintiff's contention, the Views demonstrate that the Commission fully considered and discussed all record evidence

---

[16] *See* 19 U.S.C. § 1677(7)(C)(ii)(II).

BUSINESS PROPRIETARY INFORMATION DELETED

regarding price depression and reasonably concluded that such evidence did not support a finding of price depression.

Plaintiff next attempts to discount the significance of price fluctuations for some domestic products, arguing that these particular products were unrepresentative because they were sold in [                    ].  TBW Br. at 21-22.  Plaintiff itself, however, proposed these pricing products, and in proposing them, argued that these were some of the largest volume products for it and another U.S producer, and that these products were "representative of IMTDC sales in the United States by domestic producers."  TBW Comments on Draft Questionnaires at 4-5; Final Views at 55 n.203.  Indeed, Plaintiff argued before the agency that no single pricing product would itself account for a large portion of sales given the large variety of IMTDC products, and as such, the pricing data derived from Plaintiff's proposed products were "spot on," "rock solid," and "representative" notwithstanding the overall small volumes and product coverage. TBW Comments on Draft Questionnaires at 4-6; *see also* Hearing Tr. at 49-51 (Pickard); Final Views at 56.  Based on Plaintiff's own arguments before the agency, the [                    ] of sales for some pricing products were in fact typical of the IMTDC industry, and the pricing data derived therefrom were "representative" of IMTDC pricing.

Plaintiff also proposes that this Court evaluate pricing data not based on quarterly price comparisons, per the Commission's practice and consistent with the format of its questionnaires (Blank Questionnaires (1-94), U.S. Producers' Questionnaire at IV-2; U.S. Importers' Questionnaire at III-2), but instead by creating annual weighted averages for pricing products. TBW Br. at 22 & Att. 1.  As an initial matter, here again Plaintiff failed to raise this argument or propose such methodology before the Commission.  Like Plaintiff's arguments on the methodology for calculating apparent U.S. consumption and market shares, Plaintiff again asks

30

CONFIDENTIAL BUSINESS
INFORMATION DELETED

this Court to ignore the results of calculations based on a well-established agency practice and to instead rely on calculations that Plaintiff itself did not even advocate for during the Commission proceedings.  And, here again Plaintiff is barred from making its argument for the first time on appeal.  *Sandvik*, 164 F.3d at 599.

Regardless, as noted, the questionnaires were framed at the outset --without presupposing any particular result-- to collect quarterly pricing data for the very purpose of the comparing pricing trends throughout the POI.   In contrast, Plaintiff's proposed new methodology appears to be results-driven so as to diminish the quarterly pricing trends in favor of annual averages that better support Plaintiff's position.  The price fluctuations in the quarterly pricing data, however, accurately reflect the uncontested fact that pricing for individual IMTDC products may vary greatly based on branding, customer, application and lead time.  *See* Final Views at 58.

### 2.    The Commission's Findings on Price Suppression Are Supported by Substantial Record Evidence and in Accordance With Law

With respect to price suppression,[17] the Commission found that the domestic industry's COGS to net sales ratio was steady over the POI, at [      ] percent in 2013, [      ] percent in 2014, [      ] percent in 2015, and was lower in interim 2016 ([      ] percent) than in interim 2015 ([      ] percent).  Final Views at 59.  While noting the slight increase in this ratio in 2015, the Commission noted that this increase occurred during a year in which apparent U.S. consumption and U.S. shipments both declined, which would be expected to result in an increase of the domestic industry's COGS to net sales ratio.  *Id*.  The Commission also found that the domestic industry's steady U.S. market share, and indeed increase by value, coupled with observed price increases for some domestic products even when lower priced subject imports were present in

---

[17] *See* 19 U.S.C. § 1677(7)(C)(ii)(II).

BUSINESS PROPRIETARY BUSINESS INFORMATION DELETED

the market, did not support that subject imports had prevented price increases that might otherwise have occurred to a significant degree in the domestic product.  *Id*. at 59-60 & n.224.

With respect to this issue, Plaintiff's arguments are again largely predicated on its unsustainable challenge to the Commission's analysis of market shares.  TBW Br. at 26. Otherwise, Plaintiff argues that increased costs by the domestic industry on the one hand, coupled with the presence of significant volumes of low-priced, substitutable imports on the other, are alone sufficient to establish that subject imports prevented price increases in the domestic product that might otherwise have occurred.  TBW Br. at 24-26.  However, Plaintiff's arguments omit the important requirement of a causal nexus:  that *subject imports* prevented price increases of the domestic product.  19 U.S.C. §§ 1677(7)(B)(i)(II); 1677(7)(C)(ii)(II).  The Commission reasonably found that the lack of market share shift and observed price increases for some domestic products, even when lower priced subject imports were present in the market, indicated that subject imports did not prevent increases in the domestic product prices.  Final Views at 59-60.

Plaintiff further argues that the observed price increases for the domestic product were [                                          ] and that the observed increase of the COGS to net sales ratio in 2015, [      ] percentage point, was "enormous" when accounting for the domestic industry's [      ] net income margins.  *Id*. at 23-24.  As an initial matter, TBW argued the opposite before the agency, acknowledging at the time that the domestic industry's COGS to net sales ratio did not in itself support a finding of price suppression.  Hearing Tr. at 112 (Pickard) (acknowledging a "disconnect" between the COGS to net sales ratio and Plaintiff's argument that subject imports had suppressed domestic prices).  Regardless, Plaintiff merely asks this Court to reweigh record evidence already reasonably considered by the Commission:  that a [      ] percentage point

32

NON-CONFIDENTIAL BUSINESS
INFORMATION DELETED

increase in COGS to net sales ratio is not "enormous" and was explained by declines in apparent

U.S. consumption and shipments during this time.  Final Views at 59.   Plaintiff also points to

increases in the domestic industry's SG&A costs as evidence of a cost-price squeeze (TBW Br.

at 25-26), yet the domestic industry's SG&A expenses accounted for a much smaller portion of

per unit of costs than did COGS, and also increased less absolutely than COGS over the POI.

CR at Table C-1 (listing unit COGS and SG&A expenses).  Indeed, the Commission noted the

unfavorable changes to the domestic industry's cost structure over the POI, yet reasonably

concluded that such changes resulted from declining apparent U.S. consumption and shipments,

not from subject imports preventing price increases.  Final Views at 65-66.

Plaintiff also argues that the Commission incorrectly rejected its argument that subject

imports took high-volume sales from the domestic industry and caused the domestic industry to

rely on lower volume sales and incur higher SG&A costs.  TBW Br. at 25-26.  The Commission,

however, found that the record did not show a large shift in sales volumes, noting that data on

U.S. shipments and market shares contradicted TBW's argument that the domestic industry lost

significant sales volume to subject imports.[18]  Final Views at 59-60.  As the Commission further

noted, although some purchasers responding to the questionnaires indicated they shifted from

domestic product to subject imports, the volumes involved were relatively small in quantity.  *Id.*

---

[18] Plaintiff also disagrees that it failed to cite record evidence in support of its argument before
the agency, citing to arguments in its Posthearing Brief that addressed allegations that SG&A
expenses for some domestic producers were abnormally high.  TBW Br. at 26; TBW Posthearing
Br., Exh. 1 at 53-54 (2-489).  The supplemental questionnaires cited by Plaintiff indicate that
SG&A costs for [                    ] were steady over the POI and SG&A costs for [          ]
increased only [  ] percent.  U.S. Producer Questionnaire (2-347); & U.S. Producer Questionnaire
(2-349).  These responses do not support an increase in marketing costs that resulted from sales
volumes lost to subject imports.  Further, the Commission requested that TBW itself submit
evidence to substantiate this argument, presuming that TBW would be able to provide evidence
of its own alleged increases in marketing expenses and lost sales volumes.  Hearing Tr. at 111-
112.  Yet, TBW did not submit any such evidence in its Posthearing Brief and instead cited only
to its own argumentation regarding the issue.  TBW Posthearing Br. at 10 & Exh. 1 at 47-49.

NONCONFIDENTIAL VERSION BUSINESS
INFORMATION DELETED

at 60 & n.224.  Plaintiff discounts this finding because only one of these sales was confirmed, yet Plaintiff ignores that the Commission also lists reported 2015 sales amounts by each responding purchaser, and the percentage change from 2013-2015 for purchasers who shifted to subject imports was only [    ] percent.  CR at Table V-10.  Moreover, although Plaintiff claims that the Commission "downplayed" that "the majority" (13 of 23) of responding purchasers switched from domestic to subject goods over the POI (TBW Br. at 27), Plaintiff itself "downplays" that less than half of those (6 of 13) cited price as the reason for purchasing subject imports.  CR at V-31.

Accordingly, in light of the domestic industry's steady (and increasing by value) U.S. market share, price increases for domestic products notwithstanding the presence of lower priced subject imports, and steady COGS to net sales ratio, the Commission reasonably found that subject imports did not significantly suppress prices for the U.S. product.

### 3.     The Commission's Impact Findings Are Supported By Substantial Record Evidence and In Accordance With Law

In examining the domestic industry's performance over the POI,[19] the Commission found that many of its performance indicators followed trends in apparent U.S. consumption: increasing from 2013 to 2014 before decreasing in 2015, and were lower in interim 2016 than in interim 2015.  *Id*. at 61-62.  Specifically, production-related indicators including production, capacity utilization, U.S. shipments, and net sales all followed these trends in apparent U.S. consumption, as did employment-related indicators such as the number of production-related workers, total hours worked, and wages paid.  *Id*. at 62-63. While acknowledging the domestic industry's poor and declining financial performance over the POI, the Commission found that record evidence did not support that this performance resulted from subject imports.  *Id*. at 63-

---

[19] *See* 19 U.S.C. § 1677(7)(C)(iii).

64. The Commission found that there was no increase in subject imports at the expense of the domestic industry, noting the domestic industry's steady or increasing market share over the POI. *Id*. at 64-65. Instead, the Commission found that the domestic industry's poor performance resulted from increases in the domestic industry's labor and SG&A costs that coincided with reduced output and net sales following declines in apparent U.S. consumption in 2015. *Id*. at 65. The Commission thus concluded that subject imports did not have a significant impact on the domestic industry. *Id*. at 66.

Plaintiff argues that changes in apparent U.S. consumption alone do not fully explain the domestic industry's performance, arguing that the domestic industry performed worse in 2015 than in 2013 even though apparent U.S. consumption was higher. TBW Br. at 31-32. Plaintiff's argument is premised on quantity-based consumption data, ignoring that the Commission relied primarily on value-based consumption data, which the Commission found are more reliable given the range of product mix. Final Views at 51. While apparent U.S. consumption was slightly higher in 2015 than in 2013 *by quantity*, consumption was lower in 2015 than in 2013 *by value*, the data primarily relied upon by the Commission. CR at Table C-1; Final Views at 51. In any event, as described above, the Commission did not rely on changes in consumption alone, but instead on a number of factors that together pointed away from a causal link between subject imports and the domestic industry's performance. Thus, no matter how apparent U.S. consumption and shipments are measured, the domestic industry's SG&A and labor costs both increased from 2013 to 2015, explaining further declines in the domestic industry's performance in 2015 relative to 2013. CR at Table C-1.

Plaintiff also contends that the domestic industry's increases in SG&A and labor costs were insufficient to explain the domestic industry's performance, arguing that increases in unit

CONFIDENTIAL BUSINESS
INFORMATION DELETED

costs (*e.g.*, costs divided by quantity) were less than increases in shipments by quantity. TBW

Br. at 32. Plaintiff again relies on quantity data and ignores the Commission's finding that the

large variety of IMTDCs products made quantity data less reliable than value data, a

determination not challenged by Plaintiff. Final Views at 51. When looking to value data, the

domestic industry's SG&A and direct labor costs increased between 2013 and 2015, by

($[          ]) and ($[          ]) respectively, but U.S. shipments by value decreased by

($[          ]) over this time, thus supporting a decline in financial performance as a result of

increased costs and declining shipments by value. *Costs changes calculated from* CR at Table

VI-1; *shipment changes calculated from* CR at Table III-13.

Plaintiff also reiterates its argument on price suppression to argue that the domestic

industry's poor financial performance resulted from being unable to [

]. TBW Br. at 33. As explained above, however, record evidence does not support that

subject imports prevented price increases by the domestic industry. The Commission found that

the domestic industry maintained steady or increasing market share and was able to raise prices

for IMTDC products notwithstanding lower priced subject imports being available. Final Views

at 59-60. Plaintiff again argues that the Commission should merely assume causation from the

presence of low-priced subject imports in the market, but, as already discussed the Commission

reasonably found that record evidence did not support a finding that subject imports prevented

price increases by the domestic industry that otherwise would have occurred.

Plaintiff also argues that declines in the domestic industry's average unit values

("AUVs') support its argument that the domestic industry [

]. TBW Br. at 33. AUVs, however, are of limited utility in examining products such as

IMTDCs, which vary greatly in size, characteristics, application and price, as changes in the

BUSINESS PROPRIETARY INFORMATION DELETED

AUV could merely reflect changes in product mix.  Final Views at 51 n.190; *see also Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1373-74 (Fed. Cir. 2002) (finding AUVs to be of limited utility in determining price effects in such circumstances).  As such, the Commission did not rely on AUVs in its findings, and no party argued that it should.  Plaintiff's current reference to AUVs is thus unpersuasive and untimely.

Finally, Plaintiff argues that increases in the domestic industry's AUVs in interim 2016, as U.S. shipments of subject imports decreased, support its contention that subject imports had a significant impact on the domestic industry.  TBW Br. at 33-34.  As noted above, the changes in AUVs for IMTDCs could merely reflect changes in product mix and do not provide an accurate proxy for wider price changes.  When looking to value data for the domestic industry in interim 2016, the domestic industry's U.S. shipments continued to follow trends in apparent U.S. consumption, declining from the levels in interim 2015.  CR at Table C-1.  Even though shipments of subject imports decreased more than apparent U.S. consumption, nonsubject imports increased their shipments with the result that the domestic industry's market share remained relatively steady, increasing by only [    ] percentage point.  *Id*.  While the domestic industry's financial performance improved, such improvement resulted from decreases in the domestic industry's COGS, SG&A expenses, and COGS to net sales ratio from interim 2015.  *Id*.  Thus, interim 2016 data support the Commission's conclusion that the domestic industry's performance resulted from trends in apparent U.S. consumption and the domestic industry's costs, not from subject imports.

> **4.    The Commission's Conclusions on the Lack of a Causal Link Are Supported by Substantial Record Evidence and In Accordance With Law**

As discussed above, the Commission recognized that there were significant quantities of low-priced subject imports in the U.S. market during the POI.  However, in light of the steady

market shares for subject imports and the domestic producer, the absence of significant price depressing or suppressing effects, declines in apparent U.S. consumption, and unfavorable changes in the domestic industry's cost structure, the Commission did not find that subject imports had caused injury to the domestic industry.  Plaintiff nonetheless argues that where the Commission finds significant volumes of lower priced subject imports that are good substitutes for the domestic product, and the domestic industry's performance is poor, "economic logic" dictates that the Commission must find injury.  TBW Br. at 11.  In essence, Plaintiff argues that when certain generic factors are present in the Commission's injury analysis (*e.g.*, volume, substitutability, underselling), the Commission must reach an affirmative determination.  Plaintiff's argument has no basis in law.

To the contrary, Plaintiff's proposed legal standard runs counter to the statute, which requires the Commission is to determine whether an industry in the United States is materially injured "by reason of" the imports under investigation.  19 U.S.C. § 1671d(b).  As the Commission explained in its Views (at 36-41), this evaluation must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury.  *See e.g., Swiff-Train Co. v. United States*, 793 F.3d 1355, 1360 (Fed. Cir. 2015); *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008); *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

While the statute does not prescribe any particular causation methodology that the Commission must apply, it plainly requires that the Commission determine if there is a correlation between the subject imports and the domestic industry's condition.  *Mittal*, 542 F.3d at 877-78.  Plaintiff's approach, however, would write the "by reason of" language out of the

statute.  Under Plaintiff's "economic logic," the Commission would be required to automatically find significant prices effects and impact whenever there are significant volumes of lower priced subject imports.  In fact, this Court has previously rejected similar reasoning, finding that significant volumes of lower priced subject imports do *not* necessarily result in price depression, price suppression, or significant price effects.  *Altx, Inc. v. United States*, 26 CIT 1425, 1436-37 (2002), *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004).

Moreover, contrary to Plaintiff's argument, the Commission's determinations must be based on record evidence, not on presuppositions or some supposed "economic logic."  Here, the Commission applied the correct legal standard to the facts and reasonably found that the domestic industry was not materially injured "by reason" the subject imports.

**C.      The Commission's Threat Analysis Was Supported by Substantial Record Evidence and In Accordance with Law**

The Commission properly applied the statutory threat factors and reasonably found that the domestic industry was not threatened with material injury by subject imports from Canada or subject imports from China.  Final Views at 79 & 88.  As discussed below, Plaintiff's challenges to those findings are unavailing.

**1.   The Commission Acted Within Its Discretion In Not Cumulating Subject Imports from Canada and China for Its Threat Analysis**

Cumulation of subject imports is discretionary in a threat analysis.  19 U.S.C. § 1677(7)(H) (stating that the agency "may" cumulate imports for threat "to the extent practicable.").  The Commission determined  not to cumulate subject imports from Canada and China for purposes of its threat analysis because they were not likely to compete under similar conditions in the U.S. market in the imminent future due to the closure of the largest source of Canadian imports during the POI, Baldor.  Final Views at 68.

NONCONFIDENTIAL BUSINESS
INFORMATION DELETED

Plaintiff disagrees with the manner in which the Commission exercised its discretion, arguing that the Commission's determination was "inadequately explained" because the Commission only considered the Canadian market as it had operated with Baldor in operation and failed to consider the producers of unfinished IMTDCs cast in Canada.  TBW Br. at 37.  Plaintiff's argument misconstrues the agency's analysis, which focused at length on the likely future nature of the Canadian IMTDC industry given the closure of Baldor and the production of unfinished IMTDCs cast in Canada that had been supplying Baldor.  Final Views at 68-75.  The Commission noted that Plaintiff's claims regarding the size of the casting industry in Canada were greatly inflated from those initially identified in its petition, notwithstanding the much narrower scope of investigation since that time.  *Id*. at 71-72.  Further, Baldor in its questionnaire responses had estimated that it accounted for [    ] percent of all IMTDC production in Canada and [    ] percent of exports of subject merchandise to the United States from Canada, undercutting Plaintiff's claim that a "massive" industry existed apart from Baldor.  *Id*.  With regard to foundries in Canada that may have cast unfinished IMTDCs for Baldor, the Commission noted that foundries produce a wide range of products of which IMTDCs are likely a small share.  *Id*. at 73.  Indeed, the record on imports of unfinished IMTDCs from Canada supported the Commission's conclusion:  such imports peaked at [  ] pieces in 2014 and never exceeded more than $[    ] in annual values over the POI.  *Id*.; CR at Table IV-3.  Baldor also reported increasing difficulty in sourcing blanks from Canada during the POI.  Final Views at 75.  Examining this record evidence, the Commission concluded that Baldor's closure fundamentally altered how the Canadian industry would compete in the U.S. market in future.  *Id*.

Plaintiff ignores this analysis and merely contests the Commission's conclusions.  As explained above, however, the Commission reasonably considered the nature of the IMTDC

CONFIDENTIAL BUSINESS
INFORMATION DELETED

industry in Canada following the closure of Baldor, including the presence of producers of

unfinished IMTDCs, but nonetheless concluded that Baldor's closure disrupted the industry and

resulted in subject imports from Canada not competing under similar conditions of competition

in the U.S. market with subject imports from China in the imminent future.  *Id.* at 68.

### 2. The Commission's Negative Threat Determination Regarding Subject Imports from Canada Was Supported By Substantial Record Evidence and Otherwise In Accordance With Law

Examining subject imports from Canada,[20] the Commission found no indication that

volumes of such imports were likely to be significant in the imminent future, noting that the

volume of subject imports from Canada had declined over the POI and that the sole responding

exporter from Canada, Baldor, reported that future production would be [     ] because of the

closure of its Canadian facility and its moving equipment to the United States.  *Id.* at 76-77.  The

Commission further found that given the lack of price effects or impact caused by higher

volumes of cumulated subject imports over the POI, the likely reduced future volumes of subject

imports from Canada would be unlikely to have either significant price effects or impact in the

imminent future.  *Id.* at 78-79.

Plaintiff argues that the agency's determination was inadequately explained, without

elaboration.  TBW Br. at 38.  As described above, the Commission did fully explain its

reasoning, and its threat analysis of subject imports from Canada was supported by substantial

evidence and otherwise in accordance with law.

---

[20] *See* 19 U.S.C. § 1677(7)(F)(i) (listing factors to be considered in threat analysis).

**3.  The Commission's Negative Threat Determination Regarding Subject Imports from China Was Supported By Substantial Record Evidence and Otherwise In Accordance With Law**

Examining subject imports from China, the Commission noted the Chinese IMTDC industry's large production and capacity of subject merchandise, but the Commission further found that exports to the United States had accounted for a declining share of total shipments for the industry over the POI.  Final Views at 79-80.  The total value of subject imports from China also declined over the POI.  *Id*. at 80.  The U.S. market share of subject imports from China by value remained steady during the POI, and U.S. importers did not report arranging for sizeable volumes of subject merchandise in the imminent future.  *Id*. at 80-81.  Based on this record evidence, the Commission concluded that the volume of subject imports from China was likely to continue to be significant, but that no significant increase was likely.  *Id*. at 85.  Given these likely volumes, and their lack of significant price effects or impact over the POI, the Commission concluded that subject imports from China were unlikely to have significant price effects or impact in the imminent future.  *Id*. at 86-87.

Plaintiff first challenges these conclusions because they relied upon the Commission's market share, price effects, and impact findings from its present material injury analysis, which Plaintiff argues were themselves "tainted."  TBW Br. at 39-40.  As explained *supra*, however, these findings were each supported by substantial evidence and in accordance with law, and the Commission's reliance on them for its threat analysis was similarly reasonable.

Plaintiff further argues that the Commission failed to "fill the gap" regarding its data coverage of Chinese producers by adjusting upwardly its data on the Chinese industry as facts available.  *Id*. at 40-41.  Plaintiff's contention, however, misconstrues the Commission's analysis of foreign producer questionnaires in its threat analysis.  The Commission relied on the reported

BUSINESS PROPRIETARY INFORMATION DELETED

production, capacity and shipments of the Chinese IMTDC industry to identify trends in such

data that would indicate possible future increases in exports to the United States.  Final Views at

85-86.  An upward adjustment of these data would not impact these trends and thus not affect the

Commission's conclusions.  The Commission relied upon reported U.S. shipments of subject

imports during the POI to gauge the future possible volumes of subject imports in the U.S.

market.  *Id*. at 80-81.  As explained above, the Commission reasonably relied on such importer

questionnaire responses in evaluating future subject import volumes.   Additionally, Plaintiff

overlooks the statutory requirement that any inferences made by the Commission must be based

on record evidence. 19 U.S.C. § 1677e(a) & (c); *F.lli De Cecco*, 216 F.3d at 1034.  An upward

adjustment of foreign producer questionnaires here would have run counter to this mandate and

would have been based on speculation rather than record evidence.  Accordingly, the

Commission reasonably relied on reported data from foreign producer questionnaires,

supplemented with other available record evidence, as facts available.

Plaintiff next points to evidence that it believes contradicts the Commission's finding on

future volumes of subject imports from China, specifically that the United States was [

] single destination for Chinese exports, that the Chinese home market [                 ] at the

end of the POI, and that the market share for subject imports from China increased over the POI.

TBW Br. at 40.  Plaintiff merely asks this Court to reweigh evidence reasonably considered by

the Commission.  Nonetheless, such evidence does not detract from the agency's conclusions.

The market share for subject imports from China between 2013 and 2015 increased by only [     ]

percentage points by value and [     ] percentage points by quantity.  CR at Table C-1.  Coupled

with the lack of significant volumes of subject imports from China arranged by U.S. importers,

the Commission reasonably concluded that such a modest increase in market share did not

CONFIDENTIAL BUSINESS
INFORMATION DELETED

portend a significant increase of subject imports in the imminent future.  Final Views at 80-81.

While Chinese producers' shipments in their home market decreased in 2015, so too did their

exports to the United States, with increased exports to other markets compensating for these

declines.  CR at Table VII-6.  These trends in shipments for the Chinese industry thus do not

support a pending increase in exports to the United States, as argued by Plaintiff, but rather

illustrate the availability of other markets for Chinese exports.

Finally, Plaintiff contests the Commission's analysis of arranged imports and inventories

for subject imports from China, arguing that these volumes were significant in the context of the

IMTDC industry.  TBW Br. at 41-42.  No matter the context, the Commission reasonably found

that neither arranged import levels nor inventory levels supported a substantial increase in the

imminent future of subject imports from China.  Regarding arranged imports, the Commission

reasonably concluded that arranged import levels from China for the July 2016-June 2017

period, which amounted to less than [  ] percent of total apparent U.S. consumption in 2015 and

approximately [            ] of U.S. shipments for subject imports from China in 2015, were not

"sizable" and did not support a significant increase in the imminent future.  Final Views at 81;

*Calculated from* CR at Table VII-11 and Table C-1.  Even compared to the shorter six-month

time period of interim 2016, as proposed by Plaintiff, arranged subject imports from China

amounted only to [   ] percent of total apparent U.S. consumption and [   ] percent of U.S.

shipments of subject imports from China in the interim period, notwithstanding that the data for

arranged imports encompassed a longer time period.  The Commission reasonably concluded

that such levels of arranged imports were not indicative of a likely significant increase in the

imminent future over levels observed during the POI.   Final Views at 81.

The Commission further noted increases in inventory levels of subject merchandise in

CONFIDENTIAL BUSINESS
INFORMATION DELETED

China over the POI, as well as fluctuations in U.S. importers' inventories of subject imports from China. *Id*. at 81 n.297.  As the Commission found, however, such inventories were relatively stable, with inventories in China increasing only [   ] percent between 2013 and 2015, and U.S. importers' inventories growing only [     ] percent over this time period. *Id.*, *See* CR at Tables VII-6 and C-1.  Even though U.S. importers' inventories of subject merchandise were higher in interim 2016 than in interim 2015, the inventory levels in interim 2016 were still not out of proportion with prior reported levels (*e.g.*, ending inventory levels were higher for the full year 2015), CR at Table C-1, and these levels were certainly not indicative of a significant increase in the imminent future.  Indeed, foreign producer's reported inventories and exports to the United States were both lower in interim 2016 than in interim 2015.  *Id*. at Table VII-6.   While Plaintiff disagrees with the Commission's assessment of this evidence, the Commission's conclusions were certainly reasonable and supported by substantial record evidence.

V.      **CONCLUSION**

For the foregoing reasons, the Court should affirm the Commission's negative

determinations for IMTDCs from Canada and China.

Respectfully submitted,


/s/ Dominic Bianchi
Dominic L. Bianchi
General Counsel


/s/ Andrea Casson
Andrea Casson
Assistant General Counsel for
Litigation


/s/ Brian Soiset
Brian R. Soiset
Office of General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
(202) 205-3399
*Counsel for Defendant*
*U.S. International Trade Commission*

## CERTIFICATE OF SERVICE

I, Brian Soiset, hereby certify under penalty of perjury that on this 16th day of October 2017 a true and correct copy of **DEFENDANT INTERNATIONAL TRADE COMMISSION'S OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD** was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's CM/ECF system.  Parties may access this filing through the Court's system.

 /s/ Brian Soiset
Brian Soiset
Attorney for Defendant
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC 20436
Phone: 202-205-3399
Fax: 202-205-3111
brian.soiset@usitc.gov

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached brief contains 13,849 words, according to the word-count function of the word processing system used to prepare this brief (Microsoft Word 2010).


Dated: October 16, 2017                    /s/ Brian Soiset
                                           Brian Soiset